# TAB 8

PRINCIPAL LIFE INSURANCE COMPANY

CLAIM FOR REFUND

WHISPERING WOODS LLC ISSUE

1999 - Interest Income, $1,507,090
2000 - Interest Income, $8,354,023
2001 - Interest Income, $6,896,359
2001 - Alternative Basis Adjustment, $16,759,806

Taxpayer claims refund of tax, penalties, and interest attributable to (1) the Internal Revenue Service's ("Service") erroneous inclusion in Taxpayer's 1999, 2000, and 2001 income of the accrual of Taxpayer's alleged distributive share of income of Whispering Woods LLC ("Whispering Woods"), which income when received by Whispering Woods in 2000 and 2001 represented previously taxed income within the meaning of Internal Revenue Code ("Code") section 959, and (2) the Service's erroneous decrease in the 2001 taxable year of Taxpayer's basis in its Whispering Woods investment by the aggregate amount of the distributions received by Taxpayer from Whispering Woods in 2000 and 2001. Taxpayer contends that these adjustments must be reversed in their entirety on the ground that they are based on fundamental factual and legal errors, and Taxpayer disputes all the factual assertions and legal arguments underlying such adjustments.

Taxpayer and World Trading (Delaware), Inc. ("World Trading"), an affiliate of Bankers Trust Corporation ("Bankers Trust") and Deutsche Bank AG ("Deutsche Bank"), formed Whispering Woods on November 18, 1999. Taxpayer contributed $500 million in cash in exchange for the Class A Member interest (the "Class A Member") in Whispering Woods. World Trading contributed 100 percent of the stock of Bleeker Investments Limited ("Bleeker"), Broome Investments Limited ("Broome"), MacDougal Investments Limited ("MacDougal"), and Varick Investments Limited ("Varick," and together with Bleeker, Broome and MacDougal, the "Cayman Entities"), each of which was a corporation incorporated in the Cayman Islands, in exchange for the Managing Member interest (the "Managing Member") in Whispering Woods. The total value of the stock of the Cayman Entities was $82,724,075.96. Taxpayer's investment in Whispering Woods was one of several investment transactions entered into by Taxpayer in 1999 in the ordinary course of its business.

As set forth in the Whispering Woods Operating Agreement (the "Operating Agreement"), the purpose of Whispering Woods was to acquire, manage, protect, conserve and sell or otherwise dispose of certain assets that Whispering Woods was permitted to hold under the Operating Agreement. Consistent with the provisions of the Operating Agreement, Whispering Woods invested $500 million in the class A common stock of Bluewater Creek Management Co., a Delaware corporation ("Bluewater Creek"). Bluewater Creek in turn maintained a portfolio of assets that was consistent with certain investment guidelines set forth in its bylaws.

At the time that World Trading contributed the stock of the Cayman Entities to Whispering Woods, each of the Cayman Entities had earnings and profits that consisted in whole

or in part of amounts that, for purposes of section 959(a), had previously been included in the gross income of a U.S. shareholder under section 951(a) ("PTI"). During the period that Taxpayer was the Class A Member of Whispering Woods, the profits of Whispering Woods consisted entirely of distributions from the Cayman Entities of PTI that was exempt from taxation under section 959(a). Upon receiving distributions of PTI from the Cayman Entities, Whispering Woods reduced its bases in the stock of the Cayman Entities in accordance with section 961(b).

The Operating Agreement provided, in relevant part, that the profits of Whispering Woods would be allocated 99% to the Class A Member and 1% to the Managing Member until the Class A Member had received its priority return. Under the Operating Agreement, the Class A Member's priority return was equal to an amount that resulted in an after-tax yield on Class A Member's investment of 4.70936 percent. Because Whispering Woods' profits consisted entirely of distributions from the Cayman Entities of PTI that was exempt from taxation under section 959(a), Taxpayer's distributive share of Whispering Woods' profits consisted entirely of PTI that was exempt from taxation under section 959(a).

The Operating Agreement also provided that the section 705(a)(2)(B) expenditures of Whispering Woods would be allocated 99% to the Managing Member and 1% to the Class A Member. The reduction by Whispering Woods of its basis in the stock of the Cayman Entities was a section 705(a)(2)(B) expenditure. This expenditure was thus allocated 99% to World Trading and 1% to Taxpayer in accordance with the Operating Agreement.

On November 19, 2001, Taxpayer sold its interest in Whispering Woods to BT Overseas Finance (Delaware), Inc., an affiliate of Deutsche Bank, for $499,949,895.69. This amount was equal to the balance in Taxpayer's capital account on that date plus Taxpayer's allocable share of the gain that would have been realized by Whispering Woods if its assets had been sold for their then-fair market value.

Whispering Woods was not created for the purpose of avoiding federal income taxes, and was a bona fide partnership that must be respected for federal income tax purposes. Taxpayer's investment in Whispering Woods was a bona fide equity investment that had real economic consequences to Taxpayer. Taxpayer had substantial business purposes for making its investment in Whispering Woods. The tax consequences to each partner of Whispering Woods of the operations of Whispering Woods and of the transactions between Whispering Woods and its partners had economic substance and clearly reflected each such partner's income. None of the economic substance doctrine, the sham transaction doctrine, the substance over form doctrine, the step transaction doctrine, and/or similar theories and law can be applied to disregard or recharacterize Taxpayer's investment in Whispering Woods.

The income realized by Whispering Woods from its receipt of the distributions from Cayman Entities qualified for exclusion from Whispering Woods' gross income under section 959(a) and the Treasury regulations under that provision. Whispering Woods also qualified for the accompanying reductions in its bases in the stock of Cayman Entities under section 961(b) and the Treasury regulations under that provision. Moreover, Taxpayer properly computed its adjusted basis in its interest in Whispering Woods under section 705(a) and the Treasury regulations under that provision, and the allocations of Whispering Woods' tax items to its

partners must be respected under section 704(b) and the Treasury regulations under that provision.

In addition, the partnership anti-abuse rule of Treasury regulation section 1.701-2 does not apply. Further, such Treasury regulation is invalid.

There are no judicial or other doctrines (such as economic substance doctrine, the sham transaction doctrine, the substance over form doctrine, the step transaction doctrine, and/or similar theories and law) that apply that would cause Whispering Woods not to be treated as a partnership for federal income tax purposes, or that would cause Taxpayer's interest in Whispering Woods to be treated as other than a partnership interest for federal income tax purposes. Taxpayer's interest in Whispering Woods must be respected as a partnership interest for federal income tax purposes under judicial principles and provisions of the Code, including, without limitation, section 704(e) and the Treasury regulations under that provision. Since Taxpayer received no distributions during 1999 with respect to its investment in Whispering Woods, and since neither the Cayman Entities nor Bluewater Creek made any dividend distributions during 1999, Taxpayer properly reported no income from such investment on its 1999 Tax Return. There are no statutory, regulatory, judicial, or other doctrines (such as economic substance doctrine, the sham transaction doctrine, the substance over form doctrine, the step transaction doctrine, and/or similar theories and law) that apply that would require Taxpayer to accrue income on a ratable basis during 1999, 2000, and 2001 with respect to its partnership investment in Whispering Woods

Alternatively, even if the Service is correct that Whispering Woods should not be treated as a partnership for federal income tax purposes or that Taxpayer's interest in Whispering Woods should not be treated as a partnership interest for federal income tax purposes, there are no judicial or other doctrines (such as economic substance doctrine, the sham transaction doctrine, the substance over form doctrine, the step transaction doctrine, and/or similar theories and law) that apply that would cause Bluewater Creek to be disregarded as a separate entity (i.e., as a corporation) for federal income tax purposes. Accordingly, if Taxpayer's investment in Whispering Woods is not respected as a partnership interest, the alternative recharacterization of Taxpayer's investment in Whispering Woods must be as an equity (i.e., shareholder) interest in Bluewater Creek and the priority return distributions made by Whispering Woods to Taxpayer in 2001 and 2002 would have to be characterized as dividend distributions from Bluewater Creek. In such circumstances, there are no statutory, regulatory, judicial, or other doctrines (such as economic substance doctrine, the sham transaction doctrine, the substance over form doctrine, the step transaction doctrine, and/or similar theories and law) that apply that would require Taxpayer to accrue such dividend income on a ratable basis during 1999, 2000, and 2001 with respect to a deemed equity investment in Bluewater Creek. Therefore, since Bluewater Creek made no dividend distributions during 1999, Taxpayer properly reported no income from such a deemed equity investment in Bluewater Creek on its 1999 Tax Return. Further, any such dividend distributions deemed received by Taxpayer would be eligible for the dividends received deduction provided for in section 243.

In conclusion, the Service improperly applied the Code, the Treasury regulations, and several judicial doctrines in recharacterizing Taxpayer's investment in Whispering Woods. Taxpayer maintains that none of the Code, Treasury regulations, or the doctrines have any

application to the investment it made in Whispering Woods, the income from Whispering Woods, or the allocations provided for in the Operating Agreement. Taxpayer therefore claims refund of all tax, interest, and penalties overpaid as a result of the adjustments described above.

Additional grounds upon which Taxpayer is entitled to a refund of penalties are set forth more particularly in a section of this claim devoted to penalties. Additionally, the grounds for this claim that are based on statutes of limitations are contained in a section hereof devoted to limitations grounds.

# TAB 9

PRINCIPAL LIFE INSURANCE COMPANY

CLAIM FOR REFUND

PERPETUAL SECURITIES ISSUE

2000 - Capital Loss - $28,118,073

Taxpayer claims refund of tax, penalties, and interest attributable to the Internal Revenue Service's improper disallowance of capital losses in 2000 and 2001 resulting from Taxpayer's sale of Asgard Principal Certificates in 2000, as more fully described below and in the Internal Revenue Service National Office Technical Advice Memorandum issued with respect to the Taxpayer on August 20, 2004, which is incorporated herein by reference.

I. Facts Upon Which Claim For Refund Is Based.

The transactions at issue involve Principal Life Insurance Company's ("Principal Life" or the "Taxpayer") purchase of Perpetual Securities followed by contribution of such securities to trustees of trusts in 2000 and 2001 in return for Interest Certificates and Principal Certificates issued by the trusts, and the subsequent sale of the Principal Certificates to an unrelated purchaser.

A. Business Context Of The Transactions.

The Taxpayer is a stock insurance company and indirect subsidiary of Principal Financial Group, Inc., a public company. The Taxpayer was formerly known as the Principal Mutual Life Insurance Company and is the largest member company in a family of companies known since 1985 as the Principal Financial Group. It is one of the largest insurance companies domiciled in the United States.

As part of its business, the Taxpayer issues insurance policies and annuity contracts in return for its promise to pay death or annuity benefits to the policy owner or named beneficiary. Most policies and contracts can be surrendered at the option of the owner for the accumulated surrender value or other amounts guaranteed under the contract. Thus, the Taxpayer is at risk at any time for certain described surrender values or other contractually-guaranteed payments

Under a deferred annuity contract, for example, a customer can make deposits into his contract over time. The customer can choose at any time to withdraw all or part of the funds on deposit with the Taxpayer or annuitize part or all of the contract. If annuitized, the Taxpayer must make monthly or quarterly payments of a set amount to the customer over a certain period of time, for his life, or for the life of the owner and one or more named beneficiaries. Prior to annuitization, the investment risk relating to the funds deposited could have been retained by the customer, if the contract is a variable annuity, or assumed by the Taxpayer, if the contract is a fixed annuity providing guaranteed returns. The Taxpayer, like other insurance companies, relies on actuarial science and modeling techniques to predict the actions of customers and the

need for cash to fulfill its obligations under the various policies and contracts it issues. These models are subjected to continual testing and modification as new information is obtained and new techniques developed.

1. Asset/Liability Matching.

The Taxpayer is required by the states in which it is licensed to manage its assets and liabilities so as to have sufficient liquid assets to cover the risks of surrenders and sufficient assets to cover the expected death benefits, annuity payments, and other obligations set forth in the policies and contracts. Taxpayer's business, therefore, is to invest the funds it receives from customers in order to provide sufficient returns to cover the liabilities (promises) created by the products the Taxpayer sells. The Taxpayer is subject to regulatory action (e.g., penalties) if its investment policies and procedures do not provide for adequate returns.

One of the ways the Taxpayer has chosen to meet its investment obligations is to segment its general account. This accounting procedure requires the Taxpayer to assign its products to different segments, based on the cash flows for those products and the expected liability flows over time. Under asset-liability matching ("ALM"), the assets and liabilities of each segment are separately tested to ensure that the assets and their expected cash flows meet the expected cash flow requirements of the liabilities arising under the policies or contracts.

To meet the ALM requirement, as well as other regulatory, rating agency, and GAAP requirements to which it is subject, the Taxpayer has a rigorous risk-management function. This function reviews liquidity, credit, diversification, interest rate, currency, and optionality in individual positions as well as the portfolio in the aggregate. This risk management process is integral to the Taxpayer's investment operations when it is evaluating individual asset purchases.

2. Taxpayer's Evolving Investment Objectives And Strategy.

Over the last 50 years, Taxpayer has developed significant expertise analyzing and investing in the commercial mortgage market. Although considered less liquid and more risky than other types of investments such as corporate bonds, commercial mortgages have traditionally provided Taxpayer with higher portfolio yields and more attractive intermediate-term cash flows than bonds. These intermediate-term cash flows are important to Taxpayer because they match up well with the contractual cash flows required under many of Taxpayer's liabilities. The ability to successfully underwrite and manage commercial mortgages has provided Taxpayer with a significant business advantage over its competitors.

During 1998, the commercial mortgage loan market became less attractive for several reasons. First, the market began to experience a weakening of credit quality, causing a decline in risk-adjusted returns. Second, Taxpayer was under pressure by the rating agencies to reduce its exposure to real estate and to improve the appearance of its balance sheet in anticipation of becoming a publicly traded company. As a result of these factors, Taxpayer began to allocate more of its cash flow to lower-yielding public corporate bonds. This put increased pressure on asset yields and Taxpayer's ALM plan because public corporate bonds were not generally

available in sufficient quantity to provide the intermediate-term cash flows needed by Taxpayer. As a result, Taxpayer began to look for alternatives to mortgage loans that (1) would not be treated as real estate by the rating agencies; (2) would provide higher yields than public corporate bonds; and (3) would provide the necessary intermediate-term cash flows.

This proved to be difficult since there was no large supply of assets in the intermediate-term cash flow range that were attractively priced. Taxpayer considered Treasury, money market, and single name corporate bond interest-only strips but rejected these alternatives primarily because of low cash-on-cash yields, sometimes even lower than Taxpayer's cost of funds. Very few primary issues existed. Most of the assets had to be acquired on the secondary market, which did not provide the sufficient quantity needed.

Consequently, Taxpayer decided to acquire a portfolio of Perpetual Securities in the hope of executing one or more cash-flow separation transactions to create the intermediate-term cash flows needed. Taxpayer concluded that moving down the capital structure of a highly-rated and highly-regulated bank provided better relative value than selecting a lower-rated credit and moving up the capital structure to more senior securities. The perpetual security market is a thinly traded market and provides a liquidity premium to organizations with the contacts and capabilities to assess the risks. Working with Morgan Stanley, Taxpayer was able to acquire a portfolio of Perpetual Securities and created a stream of high quality, significantly yielding cash flows that helped meet Taxpayer's need for intermediate-term cash flows.

In addition to matching cash flows from assets and liabilities, Taxpayer also used the perpetual Interest Certificates to help manage a "duration" mismatch between Taxpayer's assets and liabilities. Duration is a concept separate from cash flow matching and is an important tool used by insurance companies to manage the market value sensitivity of assets relative to liabilities due to fluctuations in market interest rates.

Duration refers to how price sensitive a financial instrument (asset or liability) is to changes in market interest rates. Fixed rate instruments have positive duration, meaning that their market value moves in the opposite direction of market interest rates. Thus, if market interest rates rise, the value of a fixed rate instrument will fall. The further out the fixed contractual cash flows are, the greater the financial instrument's price sensitivity to movements in market interest rates. For example, a ten-year zero-coupon U.S. Treasury that has all of its cash flows back-loaded at maturity will be more price sensitive than a fixed rate amortizing mortgage loan that pays its cash flows out over time. By matching the duration of its assets with the duration of its liabilities, Taxpayer ensures that the value of its equity remains relatively stable no matter which way interest rates change.

Floating rate instruments, such as money market mutual funds, have virtually no duration (or price sensitivity) because their periodic cash flows are regularly reset to current market rates. These instruments will usually trade at or near their face value. Floating rate interest-only certificates, such as the perpetual Interest Certificates, have *negative* duration, meaning that their value moves in the *same* direction as market interest rates. Thus, if market interest rates rise,

cash flow received on the perpetual Interest Certificates will also rise, making the perpetual Interest Certificates more valuable to their holders.

At the time the first perpetual security transaction was executed, the duration mismatch between Taxpayer's assets and liabilities on a portfolio basis was outside of Taxpayer's acceptable tolerances. In particular, Taxpayer's assets had greater positive duration than Taxpayer's liabilities. By selling the Principal Certificates and retaining the Interest Certificates, Taxpayer was able to add cash flows with negative duration to its asset portfolio. This had the effect of reducing the sensitivity of Taxpayer's asset portfolio to changes in interest rates, bringing it more in line with Taxpayer's liabilities. This was an advantage the perpetual Interest Certificates had over mortgage loans which have positive duration and would not have been of any benefit in addressing this portfolio duration mismatch.

B. The Perpetual Securities Transactions.

The Taxpayer entered into the first of the three transactions (the "Asgard transaction") in October, 2000. That transaction involved Perpetual Securities with a face value of $120 million. The Taxpayer entered into similar, but independent, transactions in April, 2001 (the "Seve transaction") and December, 2001 (the "Evergreen transaction"). The Seve and Evergreen transactions involved Perpetual Securities with aggregate face values of $175 million and $131 million, respectively. There are no material differences in how the three transactions were structured. Accordingly, for brevity's sake these facts will focus on only one of the transactions, the Evergreen transaction entered into in December of 2001.

The Perpetual Securities utilized in the Evergreen transaction were purchased by the Taxpayer from Morgan Stanley between November 15 and November 23, 2001, and are identified on Schedule A attached (the "Perpetual Securities"). The Perpetual Securities do not convey to their holders any voting rights with respect to their issuers. However, the Perpetual Securities entitle their holders to join with other noteholders in requesting the trustee to institute proceedings to wind up the issuer in the event of a partial default or "Reference Event."

The Evergreen Primary Trust ("Evergreen") is a Delaware business trust established pursuant to Delaware law on December 27, 2001. The Taxpayer is Evergreen's "Depositor" (trustor) and JPMorgan Chase Bank is Evergreen's principal trustee. The trust agreement provides that the trust is to be a grantor trust for purposes of Treas. Reg. § 301.7701-4.

On December 27, 2001, the Taxpayer conveyed to the trustee, without recourse, all of its rights, title, and interest in 10 specifically identified Perpetual Securities in exchange for 10 separate Principal Certificates and 10 separate Interest Certificates. The trustee held each security in a separate subaccount. Concurrently with the execution of the Evergreen Trust agreement, the Taxpayer caused the Perpetual Securities to be transferred by the issuers to the account of the trustee.

1. The Interest and Principal Certificates issued by Evergreen.

Each of the ten series of Interest and Principal Certificates represents beneficial interests in one of the Perpetual Securities held by Evergreen. For example, the A certificates represent fractional undivided beneficial interests in $15,500,000 in aggregate face amount of Perpetual Capital Floating Rate Notes issued by ANZ.

The Interest Certificates entitle a holder to receive payments equal to a pro rata share of the interest actually paid on the corresponding Perpetual Security (along with any income earned on such interest) during the "Restricted Interest Period." Barring the occurrence of certain "Reference Events" noted below, the Restricted Interest Period runs from December 27, 2001, to a specified "Redemption Date" in 2020. (The Redemption Dates of the ten series of Interest Certificates range from January 24, 2020, to June 30, 2020). Payments to the holders of the Interest Certificates are to be made on the day that interest is paid on the underlying Perpetual Security (or in some cases the following day). The Interest Certificates terminate and are automatically cancelled as of the applicable Redemption Date for that series of certificates.

The trust agreement defines the term "Reference Event" as any of the following:

(a) a default with respect to the Notes [i.e., the Perpetual Securities];

(b) a bankruptcy, insolvency, liquidation or winding up (or other similar event) with respect to the Note Issuer [i.e., the issuer of the Perpetual Security] (excluding any merger or non-bankruptcy related corporate reorganization of such issuer); or

(c) a mandatory redemption of all outstanding Notes prior to the applicable Redemption Date, for tax reasons or otherwise at the election of the Note Issuer pursuant to the terms of the underlying trust deed or any other instrument governing the Notes (a "Call Event").

To date, Taxpayer still holds all of the Interest Certificates. There have been no defaults or call events or other Reference Events.

The Principal Certificates represent an undivided beneficial interest in the corresponding Perpetual Security, exclusive of the right to interest paid on the Perpetual Security during the Restricted Interest Period. Any non-interest distributions (including partial redemptions) made on the Perpetual Security during the Restricted Interest Period are to be paid to the holders of the Principal Certificates.

On the Redemption Date for the series, the underlying Perpetual Securities are to be distributed to the holders of the Principal Certificates and the Principal Certificates are to be canceled. The Evergreen trust document provides that the holders of the Principal Certificates have the right to instruct the Trustee of Evergreen how to vote on any action requiring the vote or consent of the owners of the Perpetual Securities, and that in the absence of instructions from the holders, the Trustee is to vote "abstain." However, neither the holders of the Principal



60

Certificates nor the Trustee may take any action which will reduce or adversely impact the interest payable on the Perpetual Securities during the Restricted Interest Period, including, inter alia, redemption of the Perpetual Securities.

In the event a Perpetual Security is called prior to the applicable Redemption Date (a "Call Event"), the proceeds of the redemption (other than interest, if any) are to be distributed to the holders of the Principal Certificates. In the event of a default on the Perpetual Security or the bankruptcy, insolvency, liquidation, or the winding-up of a the issuer of the Perpetual Security (i.e., a "Reference Event" other than a Call Event), the Perpetual Securities are to be distributed to the holders of the Principal Certificates and the Principal Certificates are to be canceled. Nothing in the trust document or the certificates provides for the holders of the Interest Certificates to share in any part of the proceeds from the redemption of a Perpetual Security (other than accrued interest, if any). Likewise, neither the trust document nor the certificates provides for any part of the Perpetual Securities to be distributed to the holders of the Interest Certificates in the event of a default or other Reference Event.

2. <u>Sale of the Principal Certificates to Morgan Stanley</u>

On December 27, 2001, the Taxpayer sold and transferred the Principal Certificates to Morgan Stanley for $20,449,589. For Federal income tax purposes, the taxpayer claimed a capital loss on the transaction of $91,387,774. In calculating the claimed loss, the Taxpayer allocated the entire basis of the Perpetual Securities ($111,837,363) to the Principal Certificates. In 2001, the Taxpayer also claimed a loss of $119,280,927 upon sale of the Seve Principal Certificates to Morgan Stanley. In the same manner, Taxpayer claimed a capital loss of $80,337,354 in 2000 as a result of its sale of the Asgard Principal Certificates to Morgan Stanley.

3. <u>Morgan Stanley's Transfer of the Principal Certificates to Holly</u>

The Holly Issuer Trust ("Holly") is a Delaware business trust established pursuant to Delaware law on December 27, 2001. Morgan Stanley is Holly's trustor and JPMorgan Chase Bank is Holly's principal trustee. At the time of Holly's creation, Morgan Stanley transferred to Holly the Principal Certificates it acquired from the Taxpayer. In exchange for each series of Principal Certificates, Morgan Stanley received a series of Principal Units and Termination Units representing beneficial interests in the Principal Certificates. Each series of Principal Certificates is to be administered and accounted for as a separate trust property. The Holly trust agreement provides that the trust is to be a grantor trust for purposes of Treas. Reg. § 301.7701-4. Holly Trust, § 2.1(b). The terms of the Holly trust agreement in many respects mirror and refer back to the Evergreen trust agreement.

The purpose of the double trust structure was to provide comfort to the Principal Certificate holder against legal challenges to its ownership interest under Delaware law. The investments are nonrecourse in nature. The Principal Certificate holder did not wish to risk having a creditor "claw back" the Perpetual Securities in the event of a bankruptcy action by the Taxpayer. The trust structure provides that no creditor may attach the Perpetual Securities—only

the Interest Certificates. The Taxpayer cannot get back the Perpetual Securities under any circumstance.

The Principal Units represent the right to receive amounts equal to all payments or distributions made with respect to the underlying Principal Certificates other than certain amounts payable to the holders of the Termination Units. The Holly trust agreement also provides that the Principal Units convey the right to instruct the trustee how to vote the Principal Certificates. The Termination Units entitle the holders thereof to the right to receive amounts equal to a portion of any payments or distributions made with respect to the underlying Principal Certificates upon the occurrence of a Partial Redemption or a Reference Event. The Termination Units convey no interest in the trust property.

On the Redemption Date for a series of units (which is the same as the Redemption Date for the underlying Principal Certificate) all Termination Units in the series will terminate and be cancelled. Also at that time, the underlying Principal Certificates will be redeemed in exchange for the Perpetual Securities underlying the Principal Certificates and the Principal Units will in turn be redeemed in exchange for the Perpetual Securities. At that point the Principal Units will be cancelled. Thus, barring the occurrence of a Partial Redemption or Reference Event prior to the Redemption Date, the holders of the Principal Units will receive the Perpetual Securities underlying the Principal Certificates and the Termination Unit holders will receive nothing.

In the event of a Partial Redemption or the occurrence of a Reference Event (e.g., a default on, or call of, the Perpetual Security underlying the Principal Certificate) prior to the Redemption Date, any payments or distributions made with respect to the underlying Principal Certificates are to be made partially to the holders of the Principal Units and partially to the holders of the Termination Units.

In the case of a Partial Redemption or Call Event, holders of the Principal Units receive the "Principal Unit Cash Termination Payment," while holders of the Termination Units receive any cash payments made with respect to the underlying Principal Certificates to the extent they exceed the Principal Unit Cash Termination Payment. In the case of a Reference Event other than a Call Event, holders of the Principal Units receive the "Principal Unit Note Termination Payment" while holders of the Termination Units receive any Perpetual Securities underlying the Principal Certificates to the extent they do not constitute part of the Principal Unit Note Termination Payment.

The Principal Unit Cash Termination Payment is determined by multiplying the cash received on redemption of the Principal Certificates by the applicable allocation ratio set forth in the Holly trust agreement. Likewise, the Principal Unit Note Termination Payment is determined by multiplying the face amount of the Perpetual Securities received on redemption of the Principal Certificates by the applicable allocation ratio. The allocation ratio increases over time from around 25 percent (depending on the series) on December 27, 2001, to 100 percent on the particular series' Redemption Date

C. <u>The Termination Agreement.</u>

On December 28, 2001, the Taxpayer entered into a Termination Agreement with Morgan Stanley Credit Products Ltd. ("MSCPL") pursuant to which MSCPL agreed to make certain payments to the Taxpayer upon the occurrence of a Reference Event in exchange for the Taxpayer's payment of a premium in the amount of $5,000 with respect to each Perpetual Security. The aggregate premiums paid by Taxpayer were $50,000 with respect to the Evergreen Interest Certificates, $80,000 with respect to the Seve Interest Certificates, and $45,000 with respect to the Asgard Interest Certificates. The Termination Agreement expressly provides that Morgan Stanley "is acting as agent for both parties but does not guarantee the performance of [MSCPL]."

The term "Reference Event" is defined by reference to the Evergreen Trust agreement and includes (i) a default with respect to the perpetual security, (ii) the bankruptcy, insolvency, liquidation, or winding up of the issuer, and (iii) a call event. The amount to be paid by MSCPL in the event of a Reference Event was equal to the cash proceeds distributed by the issuer trust (i.e., Holly) multiplied by (1.00 – the allocation ratio). For each Perpetual Security, the Termination Agreement contains a table giving the allocation ratio for that Perpetual Security for each date throughout the life of the related Interest Certificate. As time goes by, the allocation ratio increases, and the amount the Taxpayer will receive in the event of a Reference Event decreases. The allocation ratios used for purposes of the Termination Agreement are identical to those used for purposes of the Holly trust agreement.

The parties regarded the likelihood of a Reference Event occurring as remote, which is reflected in the low premium paid. Nonetheless, if a Reference Event occurred, it would have rendered worthless the value of the remaining rights under the Income Certificate retained by the Taxpayer. Therefore, the purpose of the Termination Agreement was to compensate the Taxpayer with a payment in lieu of the income payments the Taxpayer would have received had a Reference Event not occurred.

II. Grounds Upon Which Claim For Refund Is Based.

A. Summary of Taxpayer's Position

The Taxpayer sold the Principal Certificates to Morgan Stanley, no allocation of any portion of Taxpayer's basis to the retained Income Certificates is required, and the loss realized on such sale is deductible under section 165.[1]

B. The Transactions Constituted Sales of the Principal Certificates

The Taxpayer sold the Evergreen Principal Certificates to Morgan Stanley in exchange for aggregate cash consideration of $20,449,589 and retained ownership of the Evergreen Interest Certificates. The courts and the Service have upheld transactions where the taxpayer

[1] In its Technical Advice Memorandum, the Service concedes that the Perpetual Securities are equity, not debt. Therefore, section 1286 does not apply.

63

sells property but retains an income interest in such property. For example, in *Heminway v. Commissioner*, 44 T.C. 96 (1965), the taxpayer's sister sold stock to the taxpayer, retaining for herself the right to receive all dividends paid on such stock for her life. The court held that the taxpayer's sister was taxable on the dividends, because although she transferred ownership of the stock to the taxpayer, she effectively retained the interest in the dividends so that they never became income of the taxpayer. *See also Bettendorf v. Commissioner*, 49 F.2d 173 (8th Cir. 1931) (reaching the same conclusion as *Heminway* under very similar facts); T.A.M. 8602006 (undated) (concluding that sale of notes with the interest coupons detached, prior to the enactment of section 1286, constituted a sale giving rise to a loss deduction).[2]

Similarly, a line of cases involving transfers of oil and gas interests with the retention of an interest in the oil produced supports treatment of the transfer as a sale. In *Thomas v. Perkins*, 301 U.S. 655, the owners of certain oil and gas leases assigned their interest in the leases to the taxpayer, with a portion of the purchase price payable solely out of one-fourth of all the oil produced. The Supreme Court held that the assignors had effectively retained ownership of one-fourth of the oil and sold the rest. The assignors, therefore, were taxed on the income from the one-fourth interest and entitled to a depletion allowance with respect thereto. *See also Palmer v. Bender*, 287 U.S. 551 (1933). *Cf. Anderson v. Helvering*, 287 U.S. 551 (holding that the assignor did not effectively retain an interest in the oil and gas property, but rather sold the entire property, because the seller was entitled to payment from the sale of the fee interest as well as from the production of oil and gas, in effect retaining a security interest, distinguishing *Thomas*). *See generally* Kenneth F. Joyce and Louis A. Del Cotto, *The AB (ABC) and BA Transactions: An Economic and Tax Analysis of Reserved and Carved Out Income Interests*, 31 Tax Law Rev. 121 (1976).

C. The Taxpayer Properly Allocated Its Basis to the Principal Certificates

When property rights are sold separately, it must be determined whether and how the cost basis is allocated. The case law governing assignment of income and, by implication, allocation of basis, dates back to the decision of the Supreme Court in *Lucas v. Earl*, 281 U.S. 111 (1930):

> There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew.

[2] Technical Advice Memoranda and Private Letter Rulings may not be used or cited as precedent. Code § 6110(k)(3). They are cited herein for the purpose of demonstrating the position taken by the Service on similar issues.

This principle was first applied in the context of a carved out, or stripped, income interest in *Helvering v. Horst*, 311 U.S. 112 (1940). In *Horst*, a father made a gift to his son of interest coupons from a bond owned by the father. The question before the Supreme Court was whether the income received by the son when the coupons matured was income to the son or to the father. The Supreme Court held that the father remained taxable on the interest income received by the son, reasoning that the father retained the "tree" and his attempt to gift the "fruits" was ineffectual:

> When, by the gift of the coupons, he has separated his right to interest payments from his investment and procured the payment of the interest to his donee, he has enjoyed the economic benefits of the income in the same manner and to the same extent as though the transfer were of earnings and in both cases the import of the statute is that the fruit is not to be attributed to a different tree from that on which it grew.

In *Hort v. Commissioner*, 313 U.S. 28 (1941), the taxpayer inherited a building subject to a 15-year lease. The lessee paid the taxpayer an amount to cancel the lease. The taxpayer argued that the amount it received for cancellation of the lease was a return of capital and that the difference between such amount received and the present value of the unmatured rental payments was deductible as a loss. The Supreme Court rejected this argument and held, because the taxpayer had no capital invested in the lease, no part of the amount received was return of capital. Instead, the entire payment was a substitute for rental payments due under the lease was includable as ordinary income. The fact that the entire payment was treated as ordinary income and not a return of basis clearly implies that no part of the building's basis was allocable to the lease.

In *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260 (1958), the Supreme Court extended the assignment of income doctrine to non-gratuitous transfers of income rights. In that case, the taxpayer owned a working interest in two commercial oil and gas leases. It repaid a debt by assigning to its creditor the right to proceeds from a stipulated amount of oil and gas and reported the assignment as a sale taxable at long-term capital gains rates. The Supreme Court held that the sales proceeds constituted ordinary income, reasoning that:

> We do not see here any conversion of a capital investment. The lump sum consideration seems essentially a substitute for what would otherwise be received at a future time as ordinary income. . . . We have held that one entitled to receive at a future date interest on a bond or compensation for services, makes a grant of it by anticipatory assignment, he realizes income as if he collected the interest or received the salary and then paid it over.

The logical corollary of this rule governing assignment of income is that the entire basis remains allocable to the corpus of the property. *See* McGrath, *Coupon Stripping Under Section 1286: Trees, Fruits, and Felines*, 38 The Tax Lawyer 267, 281 (Winter 1985). Indeed, some

authorities expressly confirm this corollary. In *Estate of Stranahan v. Commissioner*, 472 F.2d 867 (6th Cir. 1973), the taxpayer had a large interest deduction and insufficient income to offset it. In order to accelerate income to utilize the deduction, the taxpayer sold to his son the right to future dividends on stock owned by the taxpayer and reported the entire cash proceeds as income in the year of the sale. The Sixth Circuit Court of Appeals rejected the government's argument that the taxpayer, and not the son, should be taxable on the dividends, concluding that the transaction ought to be respected even though the sole aim was to accelerate income. The court held that under the "long-standing principles" of *Hort* and *P.G. Lake*, a taxpayer who assigns future income realizes ordinary income in the year of the disposition. The court distinguished *Horst* on the basis that *Horst* involved a gratuitous transfer. The entire amount of the cash proceeds was included in income, with no allocation of basis to reduce such amount.

In *Apex Corp. v. Commissioner*, 42 T.C. 1122 (1964), the taxpayer sold the right to receive income under a lease of office equipment to one corporation and then sold the underlying office equipment, subject to the lease, to another corporation. The taxpayer allocated its full basis to the underlying equipment, deducted an ordinary loss on the sale of the equipment, and reported gross income in the full amount of the proceeds received on the sale of the leases. The Service disallowed the loss, but the Tax Court upheld the taxpayer's treatment. In so holding, the Tax Court rejected an alternate argument made by the taxpayer that Treas. Reg. § 1.61-6(a) required an allocation of basis between the equipment and the leases.

*See also Shafer v. United States*, 204 F. Supp. 473 (S.D. Ohio 1962), *aff'd*, 312 F.2d 747 (6th Cir.), *cert. denied*, 373 U.S. 933 (1963) (holding that proceeds from the sale of coupons associated with Japanese government bonds constituted ordinary income); *Rhodes' Estate v. Commissioner*, 131 F. 2d 50 (6th Cir. 1942) (holding that proceeds from the sale of a right to receive a declared but unpaid dividend constituted ordinary income); Rev. Rul. 58-337, 1958-2 C.B. 13 (ruling that an assignment of a lease that transferred only the rights to the rents constitutes an assignment of ordinary income for which the grantor remains taxable); T.A.M. 8049018 (Sept. 2, 1980) (ruling that amount realized from the sale of interest coupons constituted ordinary income to the seller in the year of the sale); *Mapco, Inc. v. United States*, 556 F.2d 1107 (Fed. Cir. 1977) (stating that "[w]e also recognize that a taxpayer may sell a property right to future income. If the bona fide sale occurs at arm's length for adequate consideration, the seller is taxed in the year of sale on the amount of consideration he actually receives" unreduced by any basis).

The Service itself has also concluded that the assignment of income doctrine requires allocation of basis solely to the corpus. In T.A.M. 8602006, the taxpayer sold certain of its notes but retained the interest coupons prior to the enactment of section 1232B (now section 1286) in 1982. The Service ruled that the taxpayer is not required to allocate basis between the detached interest coupons and the stripped note principal for purposes of computing loss on the subsequent sale of the principal. The Service reviewed the *Hort*, *P.G. Lake*, *Horst*, and *Estate of Stranahan* cases and concluded:

> The Hort, Lake, Horst and Stranahan cases, despite their differing factual situations and legal issues, support the general proposition



66

> that (prior to section 1286 of the Code) when the right to future income is conveyed by an owner of property that will produce such income, the seller-owner is not permitted to offset any of his or her basis in the property against the sales proceeds. *In applying that proposition to this case, we have concluded that the basis of the notes must be allocated to the corpus of such notes and cannot be allocated between the corpus of such notes and the interest coupons.* (Emphasis added.)

The Service reached the same conclusion under very similar facts in T.A.M. 7934003 and P.L.R. 8108108. *But see* T.A.M. 8827002 (Mar. 30, 1988) (wherein the Service reversed its position).

The law therefore appears clear that a security may be separated into interest and principal components, each may be sold as separate asset, and the asset's cost basis remains allocable to the corpus interest and no portion of it is allocable to the income interest. Indeed, Congress has recognized the ability to sell interest and principal components as separate assets and, in the case of debt instruments, has provided rules to govern certain of these sales. *See* Code §§ 305(e), 1286.

D. <u>The Termination Agreement Produced No Retained Interest.</u>

The Termination Agreement was entered into between the Taxpayer and MSCPL on the day after the Taxpayer sold the Principal Certificates to Morgan Stanley. It was supported by adequate, separately bargained-for consideration. MSCPL, though affiliated with Morgan Stanley, is a separate legal entity. Moreover, the Termination Agreement expressly stated that Morgan Stanley was not guaranteeing MSCPL's performance under the agreement. MSCPL was not a party to the sale of the Principal Certificates or to either of the trust agreements and was not obligated to enter into the Termination Agreement. Nor was Morgan Stanley obligated to enter into a termination or similar agreement by reason of its purchase of the Principal Certificates or its participation in either of the trusts. These facts support the Taxpayer's position that the Termination Agreement was separate from the trust.

Assuming arguendo that the Termination Agreement is viewed as having occurred within the Evergreen Trust, it does not represent a continuing interest in the principal of the Perpetual Securities. When the Taxpayer sold the Principal Certificates to Morgan Stanley, it transferred all benefits and burdens of ownership of the principal of the Perpetual Securities and retained all benefits and burdens of ownership of the interest income from the Perpetual Securities. By entering into the Termination Agreement, the Taxpayer did not reacquire any of the benefits and burdens of ownership of the principal of the perpetual security. It cannot sell, pledge, or otherwise dispose of the Principal Certificate; it is not entitled to any principal payments on the Perpetual Security; it has no enforceable rights against either the trustees or the issuers. All it acquired was an unsecured money claim against MSCPL. The Termination Agreement simply permitted the Taxpayer to obtain a payment from MSCPL in the event a Reference Event occurred. The amount of the payment was based on a predetermined formula reflecting the parties' estimates of the economic exposure resulting from the occurrence of a Reference Event

at a given time during the term of the Termination Agreement. Accordingly, the Termination Agreement is essentially an insurance policy or guarantee by MSCPL that the Taxpayer would get the benefit of the income interest it bargained for.

The courts and the Service have concluded that the securing of similar rights does not prevent a sale from occurring. For example, in Rev. Rul. 65-185, 1965-2 C.B. 153, X, an automobile dealer, assigned customer installment contracts to Y as collateral for a loan. The agreement designated Y as X's agent to collect the installment payments from customers, and customers were instructed to make payments to Y. Payments on the installment notes were applied by Y to the payment of X's loan, but X was required to make the payments on its own note if the customer defaulted on the installment note. The Service concluded that the arrangement constituted a sale by X of the installment obligations to Y, with recourse or other guarantee of payment in the event of a customer's default on its installment note, notwithstanding that the guarantee had the effect of shifting the risk of loss to the transferor-guarantor.

The Service subsequently elaborated on the effect of such a recourse right or guarantee:

> [W]e believe that before a transaction with a guarantee against loss by the transferor is classified as a sale, the elements of the transaction should be analyzed under the same criteria used for sales where the purchaser is not personally liable on the purchase money mortgage. In other words, although the seller retains the risk of loss, a transaction can still be classified as a sale where (1) the purchaser obtains the benefit of any profit through an appreciation in value of the obligation; (2) the purchaser has the power of absolute disposition; and (3) the total purchase price is fixed when the transfer occurs.

G.C.M. 34,602 (Sept. 9, 1971); *see also Elmer v. Commissioner*, 65 F.2d 568 (2d Cir. 1933); *Mathers v. Commissioner*, 57 T.C. 666 (1972); *United Surgical Steel Co.*, 54 T.C. 1215; *Packard Cleveland Motor Co. v. Commissioner*, 14 B.T.A. 118 (1928); T.A.M. 199909002 (Sept. 30, 1998); G.C.M. 39,584 (Dec. 3, 1986); G.C.M. 37,848 (Feb. 5, 1979).

Since the payment under the Termination Agreement was designed to compensate the Taxpayer for its lost income stream in the event of an unexpected termination of the income-producing asset, the character of any payment received under the Termination Agreement would be ordinary, not a return of capital as it would be if the payment resulted from a retention of principal. In *Commissioner v. Ferrer*, 304 F.2d 125, 130-31 (2d Cir. 1962. *See also Hort v. Commissioner*, 313 U.S. 28 (1941) (holding that a lease termination payment was a substitute for rental payments, not a return of capital, and therefore constituted ordinary income); *Kathman v. Commissioner*, 50 T.C. 125 (1968) (holding that a payment from the cancellation of a contract entitling the taxpayer to sales commissions was a substitute for such commissions, and therefore constituted ordinary income).

E. Remoteness Of The Contingency Under The Termination Agreement Requires That Any Partial Interest Retained Be Deemed Negligible And Valueless.

Even if the taxpayer is considered to have retained an interest in the principal of the Perpetual Securities by virtue of the Termination Agreement, the remoteness of the occurrence of any Reference Event requires that such interest be ignored.

In Letter Ruling 200610017, a railroad conveyed its abandoned right-of-way to be used as recreational trails, but retained the right to reactivate the rail line in the future. In considering whether retention of the right to reactivate the line negated a charitable deduction, the Service acknowledged that the taxpayer had retained a partial interest in the railroad right-of-way, but it applied the "insubstantiality rule" expressed in *Stark v. Commissioner,* 86 T,C, 243 (1986), Revenue Ruling 75-66, 1975-1 C.B. 85, and Revenue Ruling 76-331. It thus held that "[w]here the interest retained by the taxpayer is so insubstantial that he has, in substance, transferred his entire interest in the property, the tax treatment should so reflect."

Equally important, the Service went on to address the separate question of the impact of remoteness on the possibility that the act or event might occur, and it held that the intended tax consequences will not be defeated where "the possibility that such act or event will occur is so remote as to be negligible." Citing *U.S. v. Dean,* 224 F.2d 26, 29 (1st Cir. 1955) and *Briggs v. Commissioner,* 72 T.C. 646 (1979), which employed the standards used in estate tax cases to determine remoteness, the Service stated that the phrase "so remote as to be negligible" means "a chance which persons generally would disregard as so highly improbable that it might be ignored with reasonable safety in undertaking a serious business transaction." Citing Revenue Ruling 85-23, 1985-1 C.B. 327, Revenue Ruling 78-255, 1978-1 C.B. 294, and Revenue Ruling 77-374, 1977-2 C.B. 329, it stated that it has "consistently ruled that the chances of an event occurring is "so remote as to be negligible" . . . when the chance that the event will occur is less than 5 percent." Moreover, since probability and possibility are factual concepts, the issue is a question of fact and the factual determination is to be made by evaluating several factors, including the incidence of the event's occurring in the past.

Applying these principles to this case, the taxpayer maintains that it can show that the chances of a Reference Event occurring under the Termination Agreement are less than 5%, and that, accordingly, any partial interest deemed retained should be ignored. Further, the remoteness of the contingency requires that any partial interest deemed retained be valued at zero, or that it be deemed incapable of valuation or *de minimis*. Under these circumstances, no portion of the basis of the Principal Certificates may be assigned to the Income Certificates.

F. Taxpayer's Non-Tax Business Purpose Shows Economic Substance

The Taxpayer's legitimate business purpose for entering into these transactions is extensively set forth in the first two portions of this narrative. That indisputable business purpose precludes a finding that the transaction is a sham and the Taxpayer's expectation of profit, i.e., an income stream, imbues the transactions with requisite economic substance.

In *Frank Lyon Co. v. U.S.*, 435 U.S. 561, 583-584 (1978), the Supreme Court issued the following mandate:

> [W]here, as here, there is a genuine multi-party transaction with economic substance which is compelled . . . by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.

In *Black & Decker Corporation v. U.S.*, 436 F.3d 431 (4th Cir. 2006), the Fourth Circuit stated:

> The sham transaction doctrine permits the IRS to disregard a transaction that literally complies with the terms of the IRC but that is *devoid of any legitimate business purpose.* (Emphasis supplied.)

Referring to *Frank Lyon Co., supra,* the Fourth Circuit stated that it distilled from that guidance the two-part test enunciated in *Rice's Toyota World, Inc. v. Comm.*, 752 F.2d 89, 91 (4th Cir. 1985:

> To treat a transaction as a sham, the court must find (1) that the taxpayer was motivated by *no business purposes* other than obtaining tax benefits in entering the transaction, and (2) that the transaction has no economic substance because *no reasonable possibility of a profit* exists. (Emphasis supplied.)

It then went on to quote from its prior decision in *Hines v. U.S.*, 912 F.2d 736, 739 (4th Cir. 1990):

> While it is important to examine both the subjective motivations of the taxpayer and the objective reasonableness of the investment, in both instances our inquiry is directed to the same question: whether the transaction contained economic substance aside from the tax consequences.

In *ACM Partnership v. Commissioner*, 157 F.3d 231, 252 (3d Cir. 1998, *cert. denied,* 526 U.S. 1017 (1999) the court held that the transaction in issue was a sham possessing neither

subjective business purpose nor objective economic substance and disallowed the loss. However, the court acknowledged that if the transaction had economic substance, the loss would have been allowable, despite the fact that it did not result in an economic detriment. *See ACM*, 157 F.2d at 248, n.31. Because the transaction had no economic substance, the entire transaction, including the tax loss, was disallowed. In the present case, the transaction had a non-tax business purpose and resulted in a real transfer of the economic benefits and burdens of ownership of the Principal Certificates. Therefore, the sale was bona fide, and any loss from that sale is deductible under section 165.

## CONCLUSION

The Taxpayer's loss upon sale of the Principal Certificates is a bona fide loss allowed under section 165. Because basis is not allocated to the stripped income interest, the transaction resulted in a bona fide capital loss deductible for tax purposes in its entirety.

SCHEDULE A

PERPETUAL SECURITIES - EVERGREEN TRANSACTION

| Issuer/ ISIN/ Symbol | Face Amount/ Issue Date | Interest/ Payment Schedule | Purchase Price |
|---|---|---|---|
| Barclays Bank GB0000779529 BACR FLOAT 0749 | $4.000.000 July 2, 1985 | 6M LIMEAN +25 Semi-annual | $3,470,000 |
| Barclays Bank GB0000777705 BACR FLOAT 0849 | $11,000,000 Feb. 14, 1986 | 6M LIBID +25 Semi-annual | $9,515,000 |
| Royal Bank of Scotland GB0007547507 RBOS FLOAT 1249 | $7,000,000 Dec. 11, 1985 | 6M LIMEAN +25 Semi-annual | $5,862,500 |
| Lloyds Bank GB0005224307 LLOY FLOAT 0649 | $27,000,000 June 7, 1985 | 6M LIBOR +25 Semi-annual | $23,346,000 |
| Lloyds Bank GB0005205751 LLOY FLOAT 1149 | $19,410,000 Nov. 21, 1985 | 3M LIBOR +18.75 Quarterly | $16,573,775 |
| National Westminster Bank GB0006267180 RBOS FLOAT 0849 | $15,700,000 July 9, 1985 | 6M LIMEAN +25 Semi-annual | $13,415,000 |
| National Westminster Bank LU0001547172 RBOS FLOAT 0849 | $15,000,000 Nov. 27, 1985 | 3M LIBID +25 Quarterly | $12,915,000 |
| Australia & New Zealand Bank GB0040024555 ANZ FLOAT 1049 | $15,500,000 Oct. 30, 1986 | 6M LIBOR +15 Semi-annual | $13,252,500 |
| BNP FR0008131403 BNP FLOATR 0949 | $6,810,000 Sept. 22, 1986 | 6M LIBOR +7.5 Semi-annual | $5,507,587 |
| Paribus GB0040811647 BNP FLOAT 0949 | $9,500,000 July 11. 1986 | 3M LIBOR +12.50 Quarterly | $7.980.000 |
| | $130,920,000 | | $111,837,362 |



72

1. Barclays Bank Notes (BACR FLOAT 0749 & BACR FLOAT 0849). The offering circulars describe the Barclays notes as "undated floating rate primary capital notes" of Barclays Bank PLC. The notes were issued by Barclays in 1985 and 1986 in denominations of $10,000 and $100,000 (one issue was for a total of $750,000,000, the second was for a total of $600,000,000). The notes have no final maturity and will never be repaid except as provided for below. The note holders are entitled to receive interest from Barclays semi-annually at an interest rate of LIBOR plus % percent (CPN = 6M LIBID + 25 basis points). The notes are unsecured obligations of Barclays, rank pari passu without any preference among them, and are subordinate to senior creditors. Payments of principal and interest are conditional on Barclays being solvent at the time of payment and immediately thereafter. If the bank would not otherwise be solvent, the amount of principal and interest in respect of the Perpetual Securities will be available to meet the losses of the bank. In the event that Barclays winds-up business in England, the noteholders will be treated as if they were the holders of a class of preference shares in the capital of the bank having a preferential right to a return of assets in the winding up over the holders of all other classes of shares for the time being in the capital of the bank. In the event of the nonpayment of interest, the note holders have no recourse against Barclays so long as Barclays has not paid dividends to its shareholders. Any such interest not paid goes into arrears. Interest in arrears shall become due in full on the earliest of (i) the date upon which a dividend is next paid on any class of share capital, (ii) the date fixed for any repayment pursuant of Condition 4 (a) or (b) [having to do with the repayment of the notes], or (iii) the commencement of a winding up in England of the Bank. Arrears of interest do not themselves bear interest. In the event Barclays Defaults on a payment of interest, a trustee identified in the offering circulars may bring a proceeding in England on the holders' behalf. The trustee shall not be bound to take any such action unless requested by an Extraordinary Resolution of the noteholders or in writing by the holders of at least 25 percent of the principal amount of the notes then outstanding. The noteholders do not have any remedy against Barclays other than the institution of proceedings for the winding up of the bank. The notes will only be repaid in the event: a) of a recovery by the trustee after default; b) Barclays exercises its option to purchase the notes from the holders; c) Barclays purchases the notes in the open market; or d) Barclays becomes required to withhold taxes.

2. Royal Bank of Scotland Notes (RBOS FLOAT 1249). The offering circulars describe the Royal Bank of Scotland notes as "undated floating rate primary capital notes" of the Royal Bank of Scotland ("RBS"). The notes are essentially identical to the Barclays notes except that they were issued in denominations of $10,000 and $250,000, and the RBS has the option to repay the notes after December, 1999.

3. National Westminster Bank Notes (RBOS FLOAT 1149 & RBOS FLOAT 0849). The offering circulars describe the Westminster notes as "primary capital floating rate notes" of National Westminster Bank ("Westminster"). In 1985, Westminster issued two series of notes in denominations of $10,000 and $100,000. Both series were for a total of $1,000,000,000. The notes are essentially identical to the Barclays notes except that they are issued by Westminster.

4. Lloyds' Bank Notes (LLOY FLOAT 0649 & LLOY FLOAT 1149). The offering circulars describe the Lloyds notes as "undated floating rate primary capital notes" of Lloyds Bank PLC. In 1985, Lloyds issued two series of notes in denominations of $10,000 (one issue was for a total of $750,000,000 and the second was for a total of $600,000,000). The terms of the notes are essentially the same as those of the Barclays notes. The holder of LLOY FLOAT 0649

is entitled to receive interest from Lloyds semi-annually at a rate.of LIBOR plus I/ percent (25 basis points). The holder of LLOY FLOAT 1149 is entitled to receive interest from Lloyds semi-annually at a rate of LIBOR plus .1875 percent (3M LIBOR + 18.75).

5. Australia and NZ Bank Notes (ANZ FLOAT 1049). The offering circulars describe the ANZ notes as "perpetual capital floating rate notes" of Australia and New Zealand Banking Group, Ltd. ("ANZ"). In 1986, ANZ issued a series of notes in denominations of $10,000 and $250,000. The notes pay interest semi-annually at a rate of LIBOR plus .15 percent. The notes are essentially identical to the Barclays notes except they are issued by ANZ.

6. BNP Notes (BNP FLOATR 0949). The offering circular describes the BNP notes as "undated subordinated floating rate notes" of Banque Nationale de Paris ("BNP"). The terms of the notes are similar to the other Perpetual Securities. The notes issued on July 11, 1986, with a face value of $6,820,000 pay interest semi-annually at a rate of LIBOR plus .75 percent (6M LIBOR +7.5). The notes issued on September 22, 1986, with a face value of $9,500,000 pay quarterly interest at a rate of LIBOR plus .12 percent (3M LIBOR +12.5). The notes are subject to French law.

# TAB 10

PRINCIPAL LIFE INSURANCE COMPANY
TAX YEAR 2000
$7,294,419

**Penalty Abatement on Perpetual Security Interest Only Investment**

Taxpayer claims a refund based on removal of an accuracy-related penalty. On audit, the examining agent assessed an accuracy penalty on this transaction. For the reasons set forth below, the application of a penalty to this transaction is inappropriate, and the penalty should be abated.

**Facts**

In September 1999, Taxpayer acquired five interest-only certificates issued by a trust (Medinah) that held a portfolio of perpetual securities. The Medinah interest-only certificates were attractive to Taxpayer because they provided higher yields than comparable investments and were not treated as real estate. However, the Medinah interest-only certificates had relatively short terms and thus were matched against shorter-term liabilities. Although attractive to Taxpayer in many respects, investments like Medinah were not available in the secondary market in the intermediate-term cash flow range. Consequently, Taxpayer decided to acquire a portfolio of perpetual securities in the hope of executing one or more cash-flow separation transactions to create the intermediate-term cash flows needed.

The Taxpayer engaged an unrelated, independent investment banker, Morgan Stanley, to assist it in acquiring the perpetual securities. The initial purchase of the securities resulted in the Taxpayer's complete ownership of the securities. Following the exchange of the perpetual securities with the trustee for the trust certificates, the Taxpayer sold the Principal Certificates to Morgan Stanley. Neither the Taxpayer nor Morgan Stanley was obligated to enter into subsequent transactions. Both parties understood that Morgan Stanley only agreed to proceed with the transaction on a "best efforts" basis. This meant that Morgan Stanley was not committed to acquiring the Principal Certificates. The Taxpayer thus understood that it might be required to hold the perpetual securities for an extended period of time and/or be faced with liquidating the securities at a gain or loss. Nor was Morgan Stanley required to resell the Principal Certificates but could have kept them for its own account. In addition, neither the Taxpayer nor Morgan Stanley provided any guarantee of pricing or value in the ultimate sale of the securities. After the close of each transaction, each party bore the risks and benefits of ownership provided by the contracts of sale.

The Taxpayer disclosed this investment transaction on its return. Upon audit, the transaction became the subject of a Technical Advice Memorandum ("TAM"). PLR 200512020, revoked and reissued by PLR 2000650017. The Taxpayer provided multiple submissions relating to the TAM.

**Law**

**A. Negligence or disregard of the rules and regulations**

Section 6662(a) imposes a tax equal to 20 percent of the portion of the underpayment to which section 6662 applies. Under section 6662(b)(1), if any portion of an underpayment is attributable to negligence or disregard of rules and regulations, the 20 percent penalty will be applied. Section 6662(c) defines negligence as any failure to make a reasonable attempt to comply with the provisions of the Title 26. Disregard includes careless, reckless, or intentional disregard. Pursuant to Treasury Regulation section 1.6662-(d), the penalty for negligence or disregard of the rules or regulations applies to any portion of an underpayment for a year to which a loss, deduction, or credit is carried, which portion is attributable to negligence or disregard of the rules or regulations in the year in which the carryback or carryover of the loss, deduction, or credit arises ("the loss or credit year").

The penalty for disregarding rules or regulations does not apply if the requirements to Treasury Regulation sections 1.6662-3(c)(1) and 1.6662-3(c)(2) are met.[1] Additionally, the penalty does not apply if the "reasonable cause and a good faith exception" as defined in section 1.6664-4 is met. If the position is contrary to a revenue ruling or notice issued by the Internal Revenue Service, the penalty is not imposed if there is a realistic possibility of being sustained on its merits.

*1. Negligence*

Negligence is defined as any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a return. Negligence also includes any failure by the taxpayer to keep adequate books and records to substantiate items. Negligence is strongly indicated where the taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion which would seem to a reasonable and prudent person "too good to be true" under the circumstances.[2]

*2. Disregard*

Disregard of the rules and regulations includes any careless, reckless or intentional disregard of the rules or regulations. Rules and regulations include the provisions of the Internal Revenue Code, temporary or final regulations, and revenue rulings and notices issued by the Internal Revenue Service. A disregard of the rules and regulations is "careless" if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation.[3]

A disregard is "reckless" if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances that demonstrate a substantial deviation form the standard of conduct that a reasonable person would observe. A disregard is

[1] If negligence is asserted, a reasonable basis and disclosure do not preclude the imposition of the penalty.
[2] Treas. Reg. section 1.6662-(b)(1)(ii).
[3] Treas. Reg. section 1.6662-(b)(2).

intentional if the taxpayer knows of the rule or regulation that is disregarded. A taxpayer who takes a position contrary to a revenue ruling or notice has not disregarded the ruling or notice is the contrary position has a realistic probability of being sustained on its merits.[4]

**Analysis**

*1. Negligence*

In applying the accuracy penalty, the Service implied that the Taxpayer had been negligent because the deal was "too good to be true." Case law interpreting negligence concentrates, among other things, on whether the party in question the party sought legal and whether the taxpayer and/or the taxpayer's advisors had any experience in making similar investments. *Charfoos v. Commissioner of Internal Revenue,* T.C. Memo 1991-292; *Reali v. Commissioner,* T.C. Memo 1984-427; *Kozlowskiv. Commissioner,* T.C. Memo 1993-430.

In entering this transaction, the Taxpayer carefully and thoroughly considered all legal, economic, business and tax factors involved in this investment. The Taxpayer assembled a team of employees with considerable experience in investment transactions to review the business, legal and tax risks of the proposed transaction before engaging in it. The team provided its analysis to Taxpayer's Investment Committee before engaging in the transaction and the transaction was approved by the Investment Committee. In fact, a similar transaction had been investigated in 1998, but was not acted upon because Taxpayer's investment analysts determined that the yield spreads were too low at that time. The internal analysis carefully reviewed all factors, including a review of an internal legal opinion on the tax issues surrounding investments in Custodial Share Receipts (also a stripped security) written in 1996.

The Taxpayer also retained a law firm to advise it regarding the legal and tax issues arising in connection with the proposed transactions, including the firm of Brown & Wood LLP.[5] Brown & Wood was highly regarded by insurance companies and banks in the area of taxation of investment transactions. The Taxpayer determined that the attorneys at Brown & Wood (Thomas Humphreys and Anthony Tuths) were competent professionals with sufficient expertise to justify reliance. The Taxpayer provided the attorneys at Brown & Wood the necessary information the attorneys needed to render an opinion, and that information was accurate. The Company received an opinion from Brown & Wood dated November 21, 2000, advising the Company regarding various tax issues relating to the transactions in question. The Taxpayer relied in good faith on that opinion in preparing its federal income tax returns for the years 2000 and 2001. This opinion was disclosed to the IRS prior to the issuance of the Statutory Notice.

---

[4] Treas. Reg. section 1.6662-4(b)(2).

[5] This firm is now known as Sidley Austin Brown & Wood.

[8] T.C. Memo 2004-179.

The Service cites *Nicole Rose Corp v. Commissioner*, 320 F.3d 282 (2d Cir 2003), for the proposition that sophisticated taxpayers cannot rely on experts to avoid the imposition of an accuracy-related penalty. However, in that case, the court held that there was no business purpose or economic substance to the transaction.

In contrast, as discussed in the TAM submissions, the Taxpayer had a well-documented business purpose. The investment also had economic substance because each party bore the risks and benefits of the transaction that could result in a meaningful change in Taxpayer's economic position. The Taxpayer engaged in the transaction as part of its credit exposure analysis as well as its asset-liability matching program.

*a. Maintenance of records*

Finally, the Taxpayer maintains adequate books and records to substantiate items. In *Westby v. Commissioner*,[8] the Service asserted negligence penalties for failure to keep adequate records despite requesting and receiving records on several different occasions. The Service argued the records were inadequate because the taxpayer did not maintain formal books of account such as a general ledger or a cash receipts and disbursements journal. The court found that the taxpayer had maintained voluminous records, as demonstrated at trial.

Here, The Taxpayer maintains an extensive accounting system, including a general ledger. Maintaining these books is another indicia that the Taxpayer has not acted negligently.

*2. Reasonable basis defense to negligence*

In accordance with Treasury Regulation section 1.6662-3(b), a return position that has a reasonable basis is not attributable to negligence. This standard is a relatively low standard. It is significantly higher than frivolous or patently improper. It is not satisfied by a position that is merely arguable or merely a colorable claim. If a return position is based on one or more of the authorities used in determining the existence of substantial authority, the position will generally satisfy the reasonable basis standard.[9] The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[10] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[11] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[12]

---

[9] Treas. Reg. section 1.6662-4(b)(3).
[10] Treas. Reg. section 1.6662-4(d)(3)(iii).
[11] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[12] Treas. Reg. section 1.6662-4(d)(3)(ii).

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. As stated in the regulations, if a return position is based one or more allowable authorities, the reasonable basis standard is generally satisfied.

Here, the Service acknowledged the lack of direct authority regarding these transactions. The examining agent requested technical advice from the National Office in February 2004, stating: "The field is unaware of any authority directly applicable to the transactions in question."

The examining agent and counsel for the Service expressed the opinion that sections 1286, 305(e) and 61, and the regulations thereunder, may control. The examining agent relied primarily on authorities relating to an allocation of basis between the principal-only certificates and the interest-only certificates. The National Office did not rely on those authorities, however, in its ruling dated August 20, 2004. Instead, it ruled that the trust did not meet the requirements for an investment trust, resulting in the creation of a tax partnership upon the sale of the principal-only certificates by Principal Life. The striking difference in the analysis supports the position of the Taxpayer that the law applicable to the transactions in question is not clear. In addition, the Taxpayer considered each of the issues raised by the examining agent in the request for technical advice, and the issues raised by the National Office in its ruling, prior to filing the tax returns for the years 2000 and 2001.

Considering the Service acknowledged that the law was unclear, it is difficult to understand the argument that the Taxpayer's position was without a reasonable basis. To the contrary, the Service's acknowledgement implies that the Taxpayer's position was reasonable; a negligence penalty should not apply to the investment transactions.

*3. Disclosure defense to disregard of the rules or regulations*

Treasury Regulation section 1.6662-3(c)(1) provides that the penalty for negligence or disregard of the rules cannot be imposed on an understatement that is attributable to a position contrary to a rule or regulation if the position is disclosed in accordance with the regulations. The penalty for disregarding rules and regulations is not imposed on any portion of an underpayment that is attributable to a position contrary to a rule or regulation if the position is adequately disclosed pursuant to the requirements of Treasury Regulation section 1.6662-3(c)(2). Disclosure is adequate under section 1.6662-3(c)(2) if a properly completed Form 8275 is filed.[13]

Because the Taxpayer concluded that its position was not contrary to the rules or regulations, it did not file Form 8275. The Taxpayer, did however, file a disclosure in accordance with the reportable transaction regulations then in place.[14] The Taxpayer recognized that the Code, Treasury regulations, cases and rulings did not directly address

[13] A taxpayer cannot rely on the annual revenue procedure for purposes of negligence portion of the negligence or disregard of the rules or regulations penalty.
[14] Treas. Reg. section 1.6011-4.

the tax consequences of these transactions. Accordingly, the Taxpayer disclosed them on the tax returns filed in 2000 and 2001, as the Service noted in its explanation. Upon audit of these returns, the Taxpayer cooperated with the Service and provided all of the relevant documents in their possession, other than documents protected from disclosure by the attorney-client privilege or attorney work-product doctrine.

The Service issued Announcement 2002-2 in late 2001. The Announcement described a disclosure initiative to encourage taxpayers to disclose their treatment of tax shelters and other items for which the imposition of the accuracy-related penalty may be appropriate if there is an underpayment of tax. The Announcement contained certain conditions that Taxpayers must meet in order to qualify for waiver of the penalty under section 6662(b) of the Code. The Taxpayer had filed its tax return for the year 2000 in March 2001; it filed a superceding return in September 2001. It disclosed the transactions in question on both returns and substantially complied with the conditions set forth in Announcement 2002-2.

The Taxpayer disclosed the transactions in its tax returns for the year 2001 filed in March 2002 and September 2002. Again, it substantially complied with the conditions set forth in the Announcement. These facts are relevant for several reasons. First, a taxpayer that substantially complied with the disclosure requirements in this notice should not be held to a higher standard in meeting the requirements for disclosure in sections 6662 and 6664. Second, a taxpayer that did not engage in listed transactions should not be treated worse than taxpayers that engaged in listed transactions but qualified for amnesty under this Announcement.

The Taxpayer's affiliated group has been under continuous exam by the Service for many years. The Taxpayer has routinely disclosed errors and items for which the tax consequences are unclear to the Service, either by a statement or form attached to the tax return or by a statement provided upon commencement of the audit in accordance with Revenue Procedure 94-69.

These actions clearly show that the Taxpayer makes every effort to comply with the law. It is inherently unfair to allow mere technicalities to apply such that the Taxpayer is liable for a penalty when the Taxpayer has alerted the Service to a position taken on the return.

*4. Reasonable cause and good faith defense*

Section 6664(c)(1) provides that no penalty may be imposed upon a showing that there was reasonable cause and taxpayer acted in good faith. "Reasonable cause and good faith" is determined on a case-by-case basis, taking into account all the pertinent facts and circumstances. Generally, the most important factor is the taxpayer's effort to assess the proper tax liability.

Upon audit of Taxpayer's returns, the examining agent requested technical advice from the National Office. The examining agent would have no need for technical advice if the law were clear. The lack of clarity in the law is also reflected by statements contained in

Notice 2003-55, which deals with lease-stripping transactions. After noting that the Service may impose penalties on taxpayers engaged in lease-stripping transactions, the Service stated:

> In addition, the Service is currently evaluating other situations in which tax benefits are claimed as a result of transactions in which the ownership of property has been separated from the right to income from the property. For example, the Service is evaluating situations in which, in exchange for consideration, one participant assigns its interest in property but retains the right to income from the property, and, by allocating all of its basis to the transferred property and none to the retained future payments, the transferor claims a loss on the transfer.

The paragraph implies that the National Office had not yet established a position regarding the tax consequences of such transactions, such as the transactions in which Principal Life engaged. If the Service had not yet established a position when it issued the Notice, it is difficult for the Service to assert that the Taxpayer did not have reasonable cause for their position.

Furthermore, in a call with Randy Bergstrom, tax counsel for the Taxpayer, on May 1, 2003, the examining agent expressed the view that he did not think penalties would apply "as the transactions were disclosed and there is some basis for the position taken by the taxpayer." Although a Field Service Advice[15] dated August 2, 2001, was issued prior to the date the Taxpayer filed the superceding return for the year 2000 and the return for 2001, a Field Service Advice issued in connection with an unrelated taxpayer is not an authority that should be taken into account in determining whether the Taxpayer had reasonable cause or acted in good faith in this case. In addition, the Advice notes that further factual development was needed before the Service could determine the applicable tax consequences. Accordingly, that Advice should be ignored. The statutes, regulations, cases and rulings on which the Taxpayer relied are set forth in the statements that the Taxpayer submitted to the National Office in connection with the request for technical advice and which are attached.

A taxpayer's reliance on an opinion may indicate reasonable reliance in good faith. In determining whether a taxpayer has relied in good faith on advice, all the facts and circumstances must be taken into account. Reliance may not be in good faith if the taxpayer knew or should have known that the advisor lacked knowledge of relevant aspects of tax law. Factors used to determine if the taxpayer acted in good faith include the following:

1. The advice must be based on all pertinent facts and circumstances, including the purpose of the transaction or structure of the transaction.

[15] Generally, for purposes of section 6662, the regulations provide which types of authority may be relied upon to determine whether the standards imposed by section 6662 and the regulations thereunder are met. Field Service Advice is not one of the listed items. For "other administrative pronouncements," such pronouncements must be published by the Service in the Internal Revenue Bulletin. Field Service Advice is not published in the Internal Revenue Bulletin.

2. The advice must not be based on unreasonable factual or legal assumptions and must not unreasonably rely on the representations, statements, findings or agreements of the taxpayer or any other person.[16]

As stated above, the Taxpayer relied on both an extensive internal review and analysis of the various factors and an opinion from external counsel who were apprised of the facts. Furthermore, the legal advice was not issued based upon unreasonable factual or legal assumptions. Likewise, the opinion did not rely on unreasonable representations, statements, findings, or agreements of the taxpayer and any other person. Other than performing extensive internal analysis and requesting external legal advice, the Taxpayer questions what else it could have done to act with reasonable cause and good faith.

*5. Tax shelter items*

Pursuant to Treasury Regulation section 1.6662-4(g)(2)(iv), a corporate taxpayer determines whether the reasonable cause and good faith exception to the substantial understatement penalty applies is determined in accordance with Treasury Regulation section 1.6664-4(e). The determination is based on all pertinent facts and circumstances. A corporation's legal justification may be taken into account in establishing that a corporation acted with reasonable cause and in good faith if certain minimum requirements are met. A failure to satisfy the minimum requirements precludes a finding of reasonable cause and good faith.

The minimum requirements are that there must be substantial authority for the tax treatment of the item and the corporation must have reasonably believed at the time the return was filed that the tax treatment was more likely than not the proper treatment. A corporation is considered to have reasonably believed the tax treatment was more likely than not the proper treatment if:

1. the corporation analyzes the pertinent facts and authorities and reasonably concludes in good faith that there is a greater than 50% likelihood that the treatment will be upheld if challenged, or
2. the corporation reasonably relies in good faith on the opinion of a professional tax advisor if the opinion is based on the advisor's analysis of the pertinent facts and authorities and unambiguously states that the tax advisor concludes that there is a greater than 50% chance the item will be upheld if challenged.[17]

Here, assuming arguendo that the investment transaction is a tax shelter, the Taxpayer and its outside counsel analyzed the facts and authorities and concluded that there is a greater than 50 percent the taxpayer will prevail.

Nor can it be contended, either for purposes of the negligence penalty under section 6662(c) or the substantial understatement penalty under section 6662(d), that a significant purpose of the overall plan or entity was avoidance or evasion of federal income taxes

[16] Treas. Reg. section 1.6664-2(c).
[17] Treas. Reg. section 1.6664-4(e)(2).

within the meaning of section 6662(d)(2)(C)(ii) or Treasury Regulation section 1.6662-4(g)(2). Taxpayer's core business is to invest the funds it receives from customers in order to provide sufficient returns to cover the liabilities (promises) created by the products it sells. It is subject to regulatory action (e.g., penalties) if its investment policies and procedures do not provide for adequate returns.

Consistent with this core aspect of its business operations, Taxpayer entered into this transaction to earn an enhanced yield and cash flow that compared favorably with other intermediate-term risk-adjusted investments. The enhanced yield was commensurate with the greater risks arising from moving down the capital structure of highly-rated and highly-regulated banks with a premium being received for the more illiquid perpetual note structure. Taxpayer viewed its investment as being an alternative to mortgage loans which were also intermediate-term investments. This investment enabled Taxpayer to move away from mortgage loans yet provide higher yields than public corporate bonds. This combined with the negative duration aspect of the investment provided positive balancing factors to Taxpayer's Asset/Liability Matching requirements. Taxpayer's purpose, therefore, was to realize the economic objective of earning a higher investment yield on intermediate-term investments.

The significance of the income separation and creation of an income-only portion from an otherwise perpetual security, therefore, was not that it avoided federal income tax, but that it increased the Taxpayer's investment options, gave Taxpayer a needed intermediate-term investment and at a yield higher than other publicly traded corporate bonds.

Moreover, availing oneself of the tax benefits provided by the Internal Revenue Code and underlying core concepts of taxation in a manner not inconsistent with the statute, Congressional purpose, or case law does not constitute a tax avoidance purpose.[18]

*6. Realistic possibility of being sustained on its merits defense*

Pursuant to Treasury Regulation 1.6694-(2)(b), a position is considered to have a realistic possibility of being sustained on the merits if a reasonable and well-informed analysis by a person knowledgeable in tax law would lead such a person to conclude that the position has approximately a one in three, or greater, chance of being sustained on its merits. The standards used to make this determination are the standards used to determine whether substantial authority exists for purposes of the substantial underpayment penalty.[19]

The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[20] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to

[18] Treas. Reg. §1.6662-4(g)(2)(ii).
[19] Treas. Reg. section 1.6694-2(b)(1), (2).
[20] Treas. Reg. section 1.6662-4(d)(3)(iii).

83

which the taxpayer has a right of appeal.[21] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[22]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. As stated in the regulation, if a return position is based one or more allowable authorities, the realistic possibility standard is generally satisfied. Although there may be different interpretations of guidance, a well-reasoned construction of the applicable provisions also establishes a realistic possibility standard for the position taken.

The Service asserts that the Taxpayer inappropriately applied Treasury Regulation section 301.7701-4(c)(2). The Taxpayer disagrees. The application of Example 4 to the investment transaction is, by analogy, a well-reasoned construction of applicable provisions. This discussion was provided to the Service in its TAM submission. Because the Taxpayer has met the requirements for having a reasonable basis for its position, has shown that the Taxpayer has reasonable cause and acted in good faith, and has substantial authority for its position, the Taxpayer has shown it has a realistic possibility of being sustained on the merits.

**Law**

**B. Substantial understatement penalty**

Section 6662(a) imposes a tax equal to 20 percent of the portion of the underpayment to which section 6662 applies. Section 6662(b)(2) provides a substantial understatement of income tax results in the 20 percent penalty. A substantial understatement exists if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000. Section 6662(d)(2)(B) allows a reduction of the amount understated for items (i) for which there is or was substantial authority for such treatment or (ii) that are adequately disclosed and for which a reasonable basis for the tax treatment exists. This reduction is not allowed, however, to any item of a corporation that is attributable to a tax shelter. A tax shelter is defined as a partnership or other entity, any investment plan or arrangement, or any other plan or arrangement if a significant purpose is the avoidance or evasion of Federal income tax.[23]

The penalty for a substantial understatement applies to any portion of an underpayment for a year to which a loss, deduction, or credit is carried that is attributable to a "tainted item" for the year in which the carryback of the loss, deduction, or credit arises. The determination of whether an understatement is substantial for a carryback year is made with respect to the return of the carryback year. Tainted items are those for which there is neither substantial authority nor adequate disclosure with respect to the loss or credit

[21] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[22] Treas. Reg. section 1.6662-4(d)(3)(ii).
[23] IRC section 6662(2)(C).

year.[24] In the case of a tax shelter item, a tainted item is any item for which there is not both substantial authority and a reasonable belief that the tax treatment is more likely than not the proper treatment.[25]

**Analysis**

*1. Substantial authority defense*

The "substantial authority" standard is an objective standard. This standard is less stringent than "more likely than not" (i.e., greater than 50 percent chance of succeeding in litigation) but stricter than the "reasonable basis" standard.[26] To determine whether substantial authority exists, the authorities must be examined. The weight of the authorities supporting the treatment must be substantial in relation to the authorities supporting a contrary position. Substantial authority is measured at the time the return is filed or on the last day of the taxable year to which the return relates.[27]

Among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[28] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[29] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[30]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. The Taxpayer had substantial authority for their position. The authorities on which the Taxpayers relied are set forth in the statements provided to the National Office (attached) in connection with the request for technical advice.

*2. Adequate disclosure and reasonable basis defense*

*a. Adequate disclosure*

Pursuant to Treasury Regulation subsections 1.6662-4(e) and (f), disclosure is adequate if made on Form 8275 or Form 8275-R or in accordance with an annual revenue procedure. Revenue Procedure 2001-52[31] applies to tax returns filed on the 2001 tax form and

[24] Treas. Reg. section 1.6662-4(c).
[25] Treas. Reg. section 1.6662-4(c)(3).
[26] Treas. Reg. section 1.6662-4(d)(2).
[27] Treas. Reg. section 1.6662-4(d)(3)(iv)(C).
[28] Treas. Reg. section 1.6662-4(d)(3)(iii).
[29] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[30] Treas. Reg. section 1.6662-4(d)(3)(ii).
[31] Revenue Procedures 99-41, I.R.B. 1999-46 and 2001-11, 2001-1 C.B. 275 apply to tax years 1999 and 2000, respectively.

85

addresses M-1 items. Additional disclosure of facts relevant to, or positions taken with respect to M-1 items is unnecessary provided that

1. the amount of the deviation from the financial books and records is not the result of a computation that includes the netting of items, and
2. the information provided reasonably may be expected to apprise the Service of the nature of the potential controversy concerning the tax treatment of the item.[32]

Additionally, forms and attachments must be completed in a clear manner and in accordance with their instructions. Amounts entered on forms must be verifiable.

As stated above, the Taxpayer did not file Form 8275 or 8275-R because it did not conclude that the investment transaction was contrary to any rule or regulation. Because the M-1 adjustment relating to the investment transaction is a result of netting, the disclosure rules of the annual revenue procedure cannot be relied upon.

However, in accordance with the reportable transaction regulations, the investment transaction was disclosed. Because the Taxpayer disclosed the transaction in accordance with the regulations that required disclosure, it is unclear why that disclosure should not be considered appropriate disclosure for purposes of the accuracy related penalty. Clearly, the Taxpayer did not fail to disclose which is the basis for penalty relief under Treasury Regulation section 1.6662-3(c). Because the transaction was disclosed, it is unfair to disallow penalty relief that is based on disclosure by the taxpayer.

*b. Reasonable basis*

In accordance with Treasury Regulation section 1.6662-4(e)(2), disclosure is only effective in relation to the understatement penalty where there is also a reasonable basis, as defined in Treasury Regulation section 1.6662-3(b)(3). In accordance with Treasury Regulation section 1.6662-3(b)(3), this standard is a relatively low standard. It is significantly higher than not frivolous or not patently improper. It is not satisfied by a position that is merely arguable or merely a colorable claim. If a return position is based on one or more of the authorities used in determining the existence of substantial authority, the position will generally satisfy the reasonable basis standard.[33] The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[34] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[35] Substantial authority can also exist for a

---

[32] Section 4.01 of (3) Rev. Proc. 2001-52, I.R.B. 2001-46
[33] Treas. Reg. section 1.6662-4(b)(3).
[34] Treas. Reg. section 1.6662-4(d)(3)(iii).
[35] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).

86

position that is supported only by a well-reasoned construction of the applicable provision.[36]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. As stated in the regulation, if a return position is based one or more allowable authorities, the reasonable basis standard is generally satisfied, and the understatement penalty should not apply. The Taxpayers adequately disclosed the item's tax treatment in the tax returns filed for the years in question, and there was a reasonable basis for the tax treatment of this item by the Taxpayers.

3. *Understatement Insufficient to Warrant Penalty*

As provided in section 6662(d)(1)(B), for there to be a substantial understatement of tax, the amount by which the tax is understated must exceed the lesser of (i) 10% of the tax required to be shown on the return, or (ii) $10,000. After reduction of the understatement for any taxable year by the portion attributable to an item for which there was substantial authority and for any item that was adequately disclosed and for which there was a reasonable basis, the remaining portion of such understatement does not exceed the lesser of 10% of the tax or $10,000. Therefore, such remaining portion is not "substantial" within the meaning of section 6662(d)(1)(B) and imposition of the accuracy-related penalty of section 6662(a) by virtue of section 6661(b)(2) is not justified.

In conclusion, all of the facts and circumstances demonstrate that the Taxpayers have met the requirements for a complete reduction of the amount of any claimed understatement attributable to the investment transaction. For the reasons stated above, no penalty should be assessed against the Taxpayers.

[36] Treas. Reg. section 1.6662-4(d)(3)(ii).

# TAB 11

PRINCIPAL LIFE INSURANCE COMPANY
TAX YEAR 2000

**Penalty Abatement on Previously Taxed Income**

Taxpayer claims a refund based on removal of an accuracy related penalty. On audit, the examining agent assessed an accuracy penalty on this transaction. For the reasons set forth below, the application of a penalty to this transaction is inappropriate, and the penalty should be denied.

**Facts**

Taxpayer and Charlton (Delaware), Inc. ("Charlton"), an affiliate of Bankers Trust Corporation ("Bankers Trust") and Deutsche Bank AG ("Deutsche Bank"), formed Whistling Pines on September 7, 2001. Taxpayer contributed $370 million in cash in exchange for the Class A Member interest (the "Class A Member") in Whistling Pines. Charlton contributed 100 percent of the stock of DB Warren Investments Limited ("Warren") and DB Rivington Investments Limited ("Rivington," and together with Warren, the "Cayman Entities"), each of which was a corporation incorporated in the Cayman Islands, in exchange for the Managing Member interest (the "Managing Member") in Whistling Pines. The total value of the stock of the Cayman Entities was $51,373,130.20. Taxpayer's investment in Whistling Pines was one of several investment transactions entered into by Taxpayer in 2001 in the ordinary course of its business.

As set forth in the Whistling Pines Operating Agreement (the "Operating Agreement"), the purpose of Whistling Pines was to acquire, manage, protect, conserve and sell or otherwise dispose of certain assets that Whistling Pines was permitted to hold under the Operating Agreement. Consistent with the provisions of the Operating Agreement, Whistling Pines invested $370 million in the class A common stock of Cedar Investment Co., a Delaware corporation ("Cedar"). Cedar in turn maintained a portfolio of assets that was consistent with certain investment guidelines set forth in its bylaws.

At the time that Charlton contributed the stock of the Cayman Entities to Whistling Pines, each of the Cayman Entities had earnings and profits that consisted in whole or in part of amounts that, for purposes of section 959(a), had previously been included in the gross income of a U.S. shareholder under section 951(a) ("PTI").
The Operating Agreement provided, in relevant part, that the profits of Whistling Pines would be allocated 99% to the Class A Member and 1% to the Managing Member until the Class A Member had received its priority return. Under the Operating Agreement, the Class A Member's priority return was equal to an amount that resulted in an after-tax yield on Class A Member's investment of 3.701 percent.

Whistling Pines did not receive any distributions of PTI from the Cayman Entities during 2001 and had no other items of income and deduction during 2001. Thus, Whistling Pines had no profits and no income (taxable or otherwise) in 2001 and, therefore,



88

Taxpayer had no income from its investment in Whistling Pines for 2001. Accordingly, Taxpayer properly reported no income or loss from its interest in Whistling Pines on its 2001 tax return.

Taxpayer and World Trading (Delaware), Inc. ("World Trading"), an affiliate of Bankers Trust Corporation ("Bankers Trust") and Deutsche Bank AG ("Deutsche Bank"), formed Whispering Woods on November 18, 1999. Taxpayer contributed $500 million in cash in exchange for the Class A Member interest (the "Class A Member") in Whispering Woods. World Trading contributed 100 percent of the stock of Bleeker Investments Limited ("Bleeker"), Broome Investments Limited ("Broome"), MacDougal Investments Limited ("MacDougal"), and Varick Investments Limited ("Varick," and together with Bleeker, Broome and MacDougal, the "Cayman Entities"), each of which was a corporation incorporated in the Cayman Islands, in exchange for the Managing Member interest (the "Managing Member") in Whispering Woods. The total value of the stock of the Cayman Entities was $82,724,075.96. Taxpayer's investment in Whispering Woods was one of several investment transactions entered into by Taxpayer in 1999 in the ordinary course of its business.

As set forth in the Whispering Woods Operating Agreement (the "Operating Agreement"), the purpose of Whispering Woods was to acquire, manage, protect, conserve and sell or otherwise dispose of certain assets that Whispering Woods was permitted to hold under the Operating Agreement. Consistent with the provisions of the Operating Agreement, Whispering Woods invested $500 million in the class A common stock of Bluewater Creek Management Co., a Delaware corporation ("Bluewater Creek"). Bluewater Creek in turn maintained a portfolio of assets that was consistent with certain investment guidelines set forth in its bylaws.

At the time that World Trading contributed the stock of the Cayman Entities to Whispering Woods, each of the Cayman Entities had earnings and profits that consisted in whole or in part of amounts that, for purposes of section 959(a), had previously been included in the gross income of a U.S. shareholder under section 951(a) ("PTI"). During the period that Taxpayer was the Class A Member of Whispering Woods, the profits of Whispering Woods consisted entirely of distributions from the Cayman Entities of PTI that was exempt from taxation under section 959(a). Upon receiving distributions of PTI from the Cayman Entities, Whispering Woods reduced its bases in the stock of the Cayman Entities in accordance with section 961(b).

The Operating Agreement provided, in relevant part, that the profits of Whispering Woods would be allocated 99% to the Class A Member and 1% to the Managing Member until the Class A Member had received its priority return. Under the Operating Agreement, the Class A Member's priority return was equal to an amount that resulted in an after-tax yield on Class A Member's investment of 4.70936 percent. Because Whispering Woods' profits consisted entirely of distributions from the Cayman Entities of PTI that was exempt from taxation under section 959(a), Taxpayer's distributive share of Whispering Woods' profits consisted entirely of PTI that was exempt from taxation under section 959(a).

The Operating Agreement also provided that the section 705(a)(2)(B) expenditures of Whispering Woods would be allocated 99% to the Managing Member and 1% to the Class A Member. The reduction by Whispering Woods of its basis in the stock of the Cayman Entities was a section 705(a)(2)(B) expenditure. This expenditure was thus allocated 99% to World Trading and 1% to Taxpayer in accordance with the Operating Agreement.

On November 19, 2001, Taxpayer sold its interest in Whispering Woods to BT Overseas Finance (Delaware), Inc., an affiliate of Deutsche Bank, for $499,949,895.69. This amount was equal to the balance in Taxpayer's capital account on that date plus Taxpayer's allocable share of the gain that would have been realized by Whispering Woods if its assets had been sold for their then-fair market value.

**Law**

**A. Negligence or disregard of the rules or regulations**

Section 6662(a) imposes a tax equal to 20 percent of the portion of the underpayment to which section 6662 applies. Under section 6662(b)(1), if any portion of an underpayment is attributable to negligence or disregard of rules and regulations, the 20 percent penalty will be applied. Section 6662(c) defines negligence as any failure to make a reasonable attempt to comply with the provisions of the Title 26. Disregard includes careless, reckless, or intentional disregard. Pursuant to Treasury Regulation section 1.6662-(d), the penalty for negligence or disregard of the rules or regulations applies to any portion of an underpayment for a year to which a loss, deduction, or credit is carried, which portion is attributable to negligence or disregard of the rules or regulations in the year in which the carryback or carryover of the loss, deduction, or credit arises ("the loss or credit year").

The penalty for disregarding rules or regulations does not apply if the requirements to Treasury Regulation sections 1.6662-3(c)(1) and 1.6662-3(c)(2) are met.[37] Additionally, the penalty does not apply if the "reasonable cause and a good faith exception" as defined in section 1.6664-4. If the position is contrary to a revenue ruling or notice issued by the Internal Revenue Service, the penalty is not imposed if there is a realistic possibility of being sustained on its merits.

*1. Negligence*

Negligence is defined as any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a return. Negligence also includes any failure by the taxpayer to keep adequate books and records to substantiate items. Negligence is strongly indicated where the taxpayer fails to make a reasonable attempt to ascertain the correctness of a

[37] Note that if negligence is asserted, a reasonable basis and disclosure do not preclude the imposition of the penalty.

deduction, credit or exclusion which would seem to a reasonable and prudent person "too good to be true" under the circumstances.[38]

*2. Disregard*
Disregard of the rules and regulations includes any careless, reckless or intentional disregard of the rules or regulations. Rules and regulations include the provisions of the Internal Revenue Code, temporary or final regulations, and revenue rulings and notices issued by the Internal Revenue Service. A disregard of the rules and regulations is "careless" if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation.[39]

A disregard is "reckless" if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances that demonstrate a substantial deviation form the standard of conduct that a reasonable person would observe. A disregard is intentional if the taxpayer knows of the rule or regulation that is disregarded. A taxpayer who takes a position contrary to a revenue ruling or notice has not disregarded the ruling or notice is the contrary position has a realistic probability of being sustained on its merits.[40]

**Analysis**

*1. Negligence*

In applying the accuracy penalty, the Service implied that the Taxpayer had been negligent because Taxpayer "should have known" that the deal was "too good to be true." Case law interpreting negligence concentrates, among other things, on whether the party in question the party sought legal and whether the taxpayer and/or the taxpayer's advisors had any experience in making similar investments. *Charfoos v. Commissioner of Internal Revenue,* T.C. Memo 1991-292; *Reali v. Commissioner,* T.C. Memo 1984-427; *Kozlowskiv. Commissioner,* T.C. Memo 1993-430.

In entering this transaction, the Taxpayer carefully and thoroughly considered all legal, economic, business and tax factors involved in this investment. The Taxpayer assembled a team of employees with considerable experience in investment transactions to review the business, legal and tax risks of the proposed transaction before engaging in it. The team provided its analysis to Taxpayer's Investment Committee before engaging in the transaction and the transaction was approved by the Investment Committee. Because the Taxpayer concluded the law was quite clear, it did not request a formal tax opinion from outside counsel.

The Service cites *Nicole Rose Corp v. Commissioner*, 320 F.3d 282 (2d Cir 2003) for the proposition that sophisticated taxpayers cannot rely on experts to avoid the imposition of

---

[38] Treas. Reg. section 1.6662-(b)(1)(ii).
[39] Treas. Reg. section 1.6662-(b)(2).
[40] Treas. Reg. section 1.6662-4(b)(2).
[42] T.C. Memo 2004-179.

an accuracy related penalty. However, in that case, the court held that there was no business purpose or economic substance to the transaction.

In contrast, the Taxpayer's business purpose was to routinely make investments to support its insurance business. The investment also had economic substance because each party bore the risks and benefits of the transaction that could result in a meaningful change in Taxpayer's economic position.

*a. Maintenance of records*

Additionally, the Taxpayer has maintained adequate books and records to substantiate items. In *Westby v. Commissioner*,[42] the Service asserted negligence penalties for failure to keep adequate records despite requesting and receiving records on several different occasions. The Service argued the records were inadequate because the taxpayer did not maintain formal books of account such as a general ledger or a cash receipts and disbursements journal. The court found that the taxpayer had maintained voluminous records, as demonstrated at trial.

Here, the Taxpayer maintains an extensive accounting system, including a general ledger. Maintaining these books is another indicia that the Taxpayer has not acted negligently.

*2. Reasonable basis defense*

In accordance with Treasury Regulation section 1.6662-3(b), a return position that has a reasonable basis is not attributable to negligence. This standard is a relatively high standard. It is significantly higher than not frivolous or not patently improper. It is not satisfied by a position that is merely arguable or merely a colorable claim. If a return position is based on one or more of the authorities used in determining the existence of substantial authority, the position will generally satisfy the reasonable basis standard.[43] The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[44] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[45] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[46]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, congressional intent, and guidance issued by the Service. The Taxpayer also relied upon an experienced team of employees. As a result of this thorough internal analysis, Taxpayer concluded that the law was quite clear.

---

[43] Treas. Reg. section 1.6662-4(b)(3).
[44] Treas. Reg. section 1.6662-4(d)(3)(iii).
[45] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[46] Treas. Reg. section 1.6662-4(d)(3)(ii).



92

As stated in the regulations, if a return position is based one or more allowable authorities, the reasonable basis standard is generally satisfied. Here, the standard is met because the return position was based on a reasoned analysis of the law, which indicated that the return position was correct.

*3. Disclosure defense to disregard of the rules or regulations*

Treasury Regulation section 1.6662-3(c)(1) provides that the penalty for negligence or disregard of the rules cannot be imposed on an understatement that is attributable to a position contrary to a rule or regulation if the position is disclosed in accordance with the regulations. The penalty for disregarding rules and regulations is not imposed on any portion of an underpayment that is attributable to a position contrary to a rule or regulation if the position is adequately disclosed pursuant to the requirements of Treasury Regulation section 1.6662-3(c)(2). Disclosure is adequate under section 1.6662-3(c)(2) if a properly completed Form 8275 is filed.[47]

Taxpayer concluded that the law was clear and did not file Form 8275. On its 2000 and 2001 returns, the Taxpayer prominently stated that it had received "Previously Taxed Income." This statement was a separate line item on Line 7 of Schedule M-1.[48] Upon audit of these returns, the Taxpayer cooperated with the Service and provided all of the relevant documents in their possession, other than documents protected from disclosure by the attorney-client privilege or attorney work-product doctrine. Because the Taxpayer did not attempt to bury the adjustment and because the Taxpayer complied with the Service's document request supporting this adjustment, it is unfair to assert a penalty merely because the Taxpayer did not attach a particular form to its return.

*4. Reasonable cause and good faith defense*

Section 6664(c)(1) provides that no penalty may be imposed upon a showing that there was reasonable cause and taxpayer acted in good faith. "Reasonable cause and good faith" is determined on a case-by-case basis, taking into account all the pertinent facts and circumstances. Generally, the most important factor is the taxpayer's effort to assess the proper tax liability.

A taxpayer's reliance on an opinion may indicate reasonable reliance in good faith. In determining whether a taxpayer has relied in good faith on advice, all the facts and circumstances must be taken into account. Reliance may not be in good faith if the taxpayer knew or should have known that the advisor lacked knowledge of relevant aspects of tax law. Factors used to determine if the taxpayer acted in good faith include the following:

1. The advice must be based on all pertinent facts and circumstances, including the purpose of the transaction or structure of the transaction.

---

[47] A taxpayer cannot rely on the annual revenue procedure for purposes of negligence portion of the negligence or disregard of the rules or regulations penalty.

[48] In 1999, this item was reported in another line item noted as Income from JVs.

93

2. The advice must not be based on unreasonable factual or legal assumptions and must not unreasonably rely on the representations, statements, findings or agreements of the taxpayer or any other person.[49]

In this case, the Taxpayer relied on its team of experienced employees who reviewed the Code, regulations, case law, and Internal Revenue Service guidance. The internal review was not based upon unreasonable factual or legal assumptions or on unreasonable representations, statements, findings, or agreements of the taxpayer and any other person. Because the Taxpayer thought the law regarding the transaction was quite clear, it did not seek a formal, written opinion. On its face, the regulation does not require a written opinion. After a careful and thorough analysis of all the business and tax factors, Taxpayer concluded that the transaction met not only its investment strategy but complied with the law. Accordingly, the Taxpayer had reasonable cause to and acted in good faith in entering the transaction.

*5. Tax shelter items*

Pursuant to Treasury Regulation section 1.6662-4(g)(2)(iv), a corporate taxpayer determines whether the reasonable cause and good faith exception to the substantial understatement penalty applies in accordance with Treasury Regulation section 1.6664-4(e). The determination is based on all pertinent facts and circumstances. A corporation's legal justification may be taken into account in establishing that a corporation acted with reasonable cause and in good faith if certain minimum requirements are met. A failure to satisfy the minimum requirements precludes a finding of reasonable cause and good faith.

The minimum requirements are that there must be substantial authority for the tax treatment of the item and the corporation must have reasonably believed at the time the return was filed that the tax treatment was more likely than not the proper treatment. A corporation is considered to have reasonably believed the tax treatment was more likely than not the proper treatment if:

1. the corporation analyzes the pertinent facts and authorities and reasonably concludes in good faith that there is a greater than 50% likelihood that the treatment will be upheld if challenged, or

2. the corporation reasonably relies in good faith on the opinion of a professional tax advisor if the opinion is based on the advisor's analysis of the pertinent facts and authorities and unambiguously states that the tax advisor concludes that there is a greater than 50% chance the item will be upheld if challenged.[50]

Here, assuming arguendo that the transaction was a tax shelter, it was concluded that there is a greater than 50 percent the taxpayer will prevail. While it is true that the

[49] Treas. Reg. section 1.6664-2(c).
[50] Treas. Reg. section 1.6664-4(e)(2).

Taxpayer did not seek a written opinion, the regulation does not require a written opinion. To the contrary, the regulation provides that a corporation acts in good faith if the corporation relies on an advisor's opinion as long as the opinion is based on the pertinent facts and authorities and the advisor concludes that there is more than a 50 percent chance the position will be upheld. Here, Taxpayer's experienced team of employees considered all of the factors carefully and as a result of this internal analysis concluded that there was a more than 50% chance of the position being upheld.

Nor can it be contended, either for purposes of the negligence penalty under section 6662(c) or the substantial understatement penalty under section 6662(d), that a significant purpose of the overall plan or entity was avoidance or evasion of federal income taxes within the meaning of section 6662(d)(2)(C)(ii) or Treasury Regulation section 1.6662-4(g)(2). Taxpayer's core business is to invest the funds it receives from customers in order to provide sufficient returns to cover the liabilities (promises) created by the products it sells. It is subject to regulatory action (e.g., penalties) if its investment policies and procedures do not provide for adequate returns. Consistent with this core aspect of its business operations, Taxpayer entered into this transaction to earn an enhanced yield that compared favorably with other short-term risk-adjusted investments. The enhanced yield was commensurate with the greater risks arising from the more complex, illiquid partnership structure. Taxpayer viewed its investment as being similar to an investment in an asset-backed security, which allows investors to maintain spreads while improving the credit quality of their investment. Likewise, the pool of taxable and tax-exempt assets held by the entity permitted Taxpayer to earn a yield comparable to BBB corporate securities while the structure raised the credit quality of the investment to the AA level. Taxpayer's purpose, therefore, was to realize the economic objective of earning an overall BBB yield over the two-year term of the partnership investment but with a higher overall credit quality estimated at AA-. The significance of the tax-exempt characteristic of the previously taxed income, therefore, was not that it avoided federal income tax, but that it increased the Taxpayer's yield on the investment. Moreover, availing oneself of the tax benefits provided by the Internal Revenue Code, such as the previously taxed income benefit provided by section 959, in a manner consistent with the statute and Congressional purpose does not constitute a tax avoidance purpose.[51]

*6. Realistic possibility of being sustained on its merits defense*

Pursuant to Treasury Regulation 1.6694-(2)(b), a position is considered to have a realistic possibility of being sustained on the merits if a reasonable and well-informed analysis by a person knowledgeable in tax law would lead such a person to conclude that the position has approximately a one in three, or greater, chance of being sustained on its merits. The standards used to make this determination are the standards used to determine whether substantial authority exists for purposes of the substantial underpayment penalty.[52]

[51] Treas. Reg. §1.6662-4(g)(2)(ii).
[52] Treas. Reg. section 1.6694-2(b)(1), (2).

The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance.[53] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[54] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[55]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. As stated in the regulation, if a return position is based one or more allowable authorities, the realistic possibility standard is generally satisfied. Although there may be different interpretations of guidance, a well-reasoned construction of the applicable provisions also establishes a realistic possibility standard for the position taken.

Here, the Taxpayer and the Service disagree on the treatment of the investment transaction, but that disagreement does not automatically nullify the efforts the Taxpayer undertook to analyze the transaction. Nor does it render the analysis unreasonable. Because the Taxpayer has met the requirements for having a reasonable basis for its position, has shown reasonable cause and that it acted in good faith, and has substantial authority for its position, the Taxpayer has shown it has a realistic possibility of being sustained on the merits.

**Law**

**B. Substantial understatement penalty**

Section 6662(a) imposes a tax equal to 20 percent of the portion of the underpayment to which section 6662 applies. Section 6662(b)(2) provides a substantial understatement of income tax results in the 20 percent penalty. A substantial understatement exists if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000. Section 6662(d)(2)(B) allows a reduction of the amount understated for items (i) for which there is or was substantial authority for such treatment or (ii) that are adequately disclosed and for which a reasonable basis for the tax treatment exists. This reduction is not allowed, however, to any item of a corporation that is attributable to a tax shelter. A tax shelter is defined as a partnership or other entity, any investment plan or arrangement, or any other plan or arrangement if a significant purpose is the avoidance or evasion of Federal income tax.[56]

The penalty for a substantial understatement applies to any portion of an underpayment for a year to which a loss, deduction, or credit is carried that is attributable to a "tainted

---

[53] Treas. Reg. section 1.6662-4(d)(3)(iii).
[54] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[55] Treas. Reg. section 1.6662-4(d)(3)(ii).
[56] IRC section 6662(2)(C).

96

item" for the year in which the carryback of the loss, deduction, or credit arises. The determination of whether an understatement is substantial for a carryback year is made with respect to the return of the carryback year. Tainted items are those for which there is neither substantial authority nor adequate disclosure with respect to the loss or credit year.[57] In the case of a tax shelter item, a tainted item is any item for which there is not both substantial authority and a reasonable belief that the tax treatment is more likely than not the proper treatment.[58]

**Analysis**

*1. Substantial authority defense*

The "substantial authority" standard is an objective standard. This standard is less stringent than "more likely than not" (i.e., greater than 50 percent chance of succeeding in litigation) but stricter than the "reasonable basis" standard.[59] To determine whether substantial authority exists, the authorities must be examined. The weight of the authorities supporting the treatment must be substantial in relation to the authorities supporting a contrary position. Substantial authority is measured at the time the return is filed or on the last day of the taxable year to which the return relates.[60]

Among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[61] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[62] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[63]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. Substantial authority for the transaction exists.

*2. Adequate disclosure and reasonable basis defense*

*a. Adequate disclosure*

Pursuant to Treasury Regulation sections 1.6662-4(e) and (f), disclosure is adequate if made on Form 8275 or Form 8275-R or in accordance with an annual revenue procedure.

---

[57] Treas. Reg. section 1.6662-4(c).
[58] Treas. Reg. section 1.6662-4(c)(3).
[59] Treas. Reg. section 1.6662-4(d)(2).
[60] Treas. Reg. section 1.6662-4(d)(3)(iv)(C).
[61] Treas. Reg. section 1.6662-4(d)(3)(iii).
[62] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[63] Treas. Reg. section 1.6662-4(d)(3)(ii).

97

Revenue Procedure 2001-52[64] applies to tax returns filed on the 2001 tax form and addresses M-1 items. Additional disclosure of facts relevant to, or positions taken with respect to M-1 items is unnecessary provided that

1. the amount of the deviation from the financial books and records is not the result of a computation that includes the netting of items, and

2. the information provided reasonably may be expected to apprise the Service of the nature of the potential controversy concerning the tax treatment of the item.[65]

Additionally, forms and attachments must be completed in a clear manner and in accordance with their instructions. Amounts entered on forms must be verifiable.

As stated above, the Taxpayer did not file Form 8275 or 8275-R because it did not conclude that the investment transaction was contrary to any rule or regulation. However, the Taxpayer did report a separate M-1 item.[66] The item was reported in tax years 2000 and 2001 as "Previously Taxed Income" on line 7 of Schedule M-1. This adjustment is not the result of netting.

The seminal case establishing the standard to measure whether an item was adequately disclosed is *Schirmer v. Commissioner.*[67] The *Schirmer* case is one of many hobby loss cases. In *Schirmer*, the taxpayer was a mechanical engineer who also owned a farm. The issue before the court was whether the farming activity was entered into for profit. The court held that the farm was a hobby activity. The taxpayer reported the farm's income and expenses on Schedule F and filed Form 4562 for depreciation and amortization deductions.

The court found that the inclusion of the schedules with the return did not constitute adequate disclosure. The information provided "was insufficient to enable respondent to identify the potential controversy involved here, that is whether petitioner engaged in the activity for profit."

None of the cases concluding that the disclosure was adequate directly address an M-1 adjustment. Instead, the cases deal with forms or statements attached to the return.[68]

---

[64] Revenue Procedures 99-41, I.R.B. 1999-46 and 2001-11, 2001-1 C.B. 275 apply to tax years 1999 and 2000, respectively.

[65] Section 4.01 of (3) Rev. Proc. 2001-52, I.R.B. 2001-46

[66] The Taxpayer reported the M-1 adjustment as a separate line item in years 2000 and 2001. In 1999, the Taxpayer had not received a distribution from the LLC. However, income had been accrued for statutory purposes, and a resulting M-1 adjustment was made. The adjustment was not separately itemized. However because the Taxpayer has substantial authority for its position, the substantial understatement penalty should not apply to tax year 1999.

[67] 89 T.C. 277 (1987).

[68] See *Elliot v. Commissioner*, 73 T.C.M. 3197 (1997) (adequate disclosure where taxpayer attached Form 8275 claiming deduction under section 1244 but abandons that position to deduct the losses as bad debts); *Henry v. Commissioner*, 73 T.C.M. 1769 (1997) (attaching a statement indicating options with a zero basis was adequate to apprise the Service of the issue of proper reporting as long term capital gain);

Here, however, the M-1 adjustment was clearly set out as a separate line item, including which company in the affiliated group earned the income. The adjustment was clearly identified as "Previously Taxed Income." This should be considered more than enough to "to identify the potential controversy involved," i.e. whether the income was previously taxed income and therefore excludable from taxable income.

*b. Reasonable basis*

In accordance with Treasury Regulation section 1.6662-4(e)(2), disclosure is only effective in relation to the understatement penalty where there is also a reasonable basis, as defined in Treasury Regulation section 1.6662-3(b)(3). In accordance with Treasury Regulation section 1.6662-3(b)(3), this standard is a relatively low standard. It is significantly higher than frivolous or patently improper. It is not satisfied by a position that is merely arguable or merely a colorable claim. If a return position is based on one or more of the authorities used in determining the existence of substantial authority, the position will generally satisfy the reasonable basis standard.[69] The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance.[70] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[71] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[72]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. As stated in the regulation, if a return position is based one or more allowable authorities, the reasonable basis standard is generally satisfied, and the understatement penalty should not apply. The Taxpayers adequately disclosed the

---

*Dibsy v. Commissioner*, 70 T.C.M. 918 (1995) (reporting business income from a liquor store on Schedule C and a "transaction involving the same liquor store which produced zero capital gain as reported on Schedule D" was adequate to alert the Service to identify the controversy – whether the taxpayers engaged in a tax free exchange under section 1031); *Mayhew v. Commissioner*, 63 T.C.M. 1984 (1992) (adequate disclosure was found where the taxpayer reported a capital gain resulting from the sale of a partnership interest even though the court held the income to be ordinary); *Rebecca K. Crown Income Charitable Fund v. Commissioner*, 98 T.C. 327 (1992) (filing Forms 5227, 1041-A, and 1041 adequately disclosed that the trust was structured as a charitable lead trust, that an annual annuity of $975,000 was required to be paid, and that the trust claimed charitable deductions in excess of the annual annuity amount, putting the Service on notice that the claimed deductions might exceed the amounts paid to charitable beneficiaries under the terms of the trust agreement for purposes of section 642(c)); *Zermeno v. Commissioner*, 62 T.C.M. 1155 (1991) (statement explaining interest income was not effectively connected income was adequate); *Pinson v. Commissioner*, 59 T.C.M. 554 (1990) (adequate disclosure where statement disclosing underlying facts and other documents outlining their legal position and pursuit of civil recourse was sufficient for a theft loss deduction).

[69] Treas. Reg. section 1.6662-4(b)(3).

[70] Treas. Reg. section 1.6662-4(d)(3)(iii).

[71] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).

[72] Treas. Reg. section 1.6662-4(d)(3)(ii).



99

item's tax treatment in the tax returns filed for the years in question, and there was a reasonable basis for the tax treatment of this item by the Taxpayers.

3. *Understatement Insufficient to Warrant Penalty*

As provided in section 6662(d)(1)(B), for there to be a substantial understatement of tax, the amount by which the tax is understated must exceed the lesser of (i) 10% of the tax required to be shown on the return, or (ii) $10,000. After reduction of the understatement for any taxable year by the portion attributable to an item for which there was substantial authority and for any item that was adequately disclosed and for which there was a reasonable basis, the remaining portion of such understatement does not exceed the lesser of 10% of the tax or $10,000. Therefore, such remaining portion is not "substantial" within the meaning of section 6662(d)(1)(B) and imposition of the accuracy-related penalty of section 6662(a) by virtue of section 6661(b)(2) is not justified.

In conclusion, all of the facts and circumstances demonstrate that the Taxpayers have met the requirements for a complete reduction of the amount of any claimed understatement attributable to the investment transaction. For the reasons stated above, no penalty should be assessed against the Taxpayers.

# TAB 12

PRINCIPAL LIFE INSURANCE COMPANY

STATUTE OF LIMITATIONS ISSUE

TAX YEAR 2000

$50,152,074

Principal Life Insurance Company ("Principal") requests refund of taxes and penalties paid plus assessed interest paid with respect thereto and statutory interest as allowable by law for tax years 1996, 1997, 1998, 1999, and 2000 because the Service did not timely assess tax in those years.

## I. Facts Upon Which Claims For Refund Is Based.

### A. Limitations Periods and Statutory Notices of Deficiency.

Pursuant to extensions of time granted by Principal to IRS (Forms 872), the periods within which assessments could be made for the taxable years 1999 and 2000 were set to expire on December 31, 2004. On October 28, 2004, as it was about to wrap up its examination of Principal's returns for the taxable years 1999-2001, IRS served on Principal a "designated summons" under IRS §6503(j) relating to the years 1999 and 2000. On the same date, IRS served a similar designated summons on Deutsch Bank as a third-party recordkeeper. The summonses called for return dates of November 9 and December 15, respectively. These designated summonses would have kept the limitations periods for 1999 and 2000 open during any judicial summons enforcement proceeding and for a period of at least 60 days thereafter.

On November 9, 2004, Principal produced 5,600 pages of documents to IRS in response to the summons and indicated it would produce more before December 15. By December 8, it had made three submissions totaling 10,000 pages of documents, including three privilege logs identifying documents not produced because of invocation of the attorney-client privilege. On the date of its third and final submission, December 8, Principal advised IRS that it believed it was then in full compliance with the summons issued to it. On December 15, Deutsch Bank submitted to IRS in NYC seven boxes containing 13,000 pages of documents and indicated it would produce more in the months that followed.

IRS chose not to initiate any judicial summons enforcement action with respect to any remaining documents. Instead, on December 29, 2004, it issued to Principal its statutory notices of deficiency (90-day letters) asserting deficiencies and penalties for the taxable years 1996-2000 (the years 1996 through 1998 remained open for this purpose because the NOL from 2001 had been carried back to them). The 90-day period in which Principal could have contested the deficiencies in Tax Court, being the same 90-day period in which IRS was prohibited from making an assessment and during which the running of the statute of limitations was suspended, would have expired on March 29, 2005. Therefore, as a result of the additional 60 days tacked

on to the limitations period by virtue of §6503(a), the statute of limitations on assessments for 1999 and 2000 would typically (but for the January 28, 2005 payments by Principal hereinafter described) have expired on May 31, 2005.

As indicated above, 2001 was a loss year for Principal that generated an NOL carryback to 1996-1998, and, through the quick refund procedure, Principal received refunds of taxes paid for the years 1996-1998 shortly after filing its 2001 return on June 24, 2002.

IRS' statutory notice of deficiency issued on December 29, 2004 asserted proposed assessments of tax of $165 million and $129 million for 1999 and 2000, respectively, but it also asserted proposed assessments of $9 million, $22 million, and $38 million for 1996, 1997, and 1998 (plus, in each case, penalties). These deficiencies asserted for 1996, 1997, and 1998 were due to disallowance of carrybacks from 1999, 2000, and 2001. According to this 90-day notice (p. 19), $19.7 million of Whispering Woods previously-taxed income for 2001 and $4.3 million of Whistling Pines previously-taxed income for 2001 were being disallowed and, alternatively, the Whispering Woods $48 million basis adjustment in 2001 was being disallowed, resulting in decrease of the 2001 carryback.

While there was no tax attributable to Principal's operations for 2001 (because of the NOL for that year), there was $1 million in tax due for 2001 as a result of carryforward of the §453A interest on deferred tax issue from 1991 that was recently tried in the Court of Federal Claims. Pursuant to an application for extension, an extension of time to file the 2001 return had been granted through September 15, 2002, and, as stated above, Principal filed its 2001 return on June 24, 2002. It later filed an amended return for 2001 on September 13, 2002. Accordingly, the regular three-year statute of limitations on assessment for 2001 would not have expired until June 24, 2005. IRS' statutory notice of deficiency (90-day letter) for the §453A interest in 2001 was issued on March 1, 2005.

**B. Deposits/Payments.**

On January 13, 2005, through five wire transfers each relating to specific taxable years 1996-2000, Principal deposited $444,000,000 to a U.S. Treasury Tax & Loan Account in Minneapolis, and instructed IRS by letter that such amount be treated as a deposit in the nature of a cash bond in accordance with IRC §6603 and Rev. Proc. 84-58.

On January 28, 2005, Principal sent a letter to IRS requesting it to apply the deposit for each year to payment of the federal income tax, interest and penalty in the following amounts for each year:

| Year | Tax | Penalty | Interest | Total |
|---|---|---|---|---|
| 1996 | $ 8,806,758 | $ 961,609 | $ 2,032,704 | $ 11,801,071 |
| 1997 | $ 22,097,933 | $ 780,951 | $ 1,728,429 | $ 24,607,313 |
| 1998 | $ 37,509,413 | $ 7,491,744 | $ 6,303,004 | $ 51,304,161 |
| 1999 | $164,888,638 | $10,848,700 | $24,358,720 | $200,096,058 |

| | | | | |
|---|---|---|---|---|
| 2000 | $128,727,605 | $ 7,294,419 | $19,182,961 | $155,204,985 |
| Total | $362,030,347 | $27,377,423 | $53,605,821 | $443,013,591 |

**C. IRS Transcripts and Assessments.**

IRS has provided two sets of transcripts for each of the years 1996-2001. The first set shows an issuance date of May 27, 2005 for the tax years 1996 and 1997 and an issuance date of June 2, 2005 for the tax years 1998, 1999, 2000, and 2001. The last entry on all of them (except 2001) is dated April 14, 2005, and, while they all show the cash bond deposit on January 13, 2005, none of them shows any assessment of the deficiencies asserted in the 90-day notices. The last entry date on the 2001 transcript is dated April 28, 2003.

The second set of IRS transcripts is dated July 18, 2005. These transcripts show entries dated May 27, 2005 (presumably purported assessments made on that date) as follows:

| | |
|---|---|
| 1996 | (none) |
| 1997 | $23,727,866 |
| 1998 | 45,829,523 |
| 1999 | 175,737,338 |
| 2000 | 136,550,585 |

These amounts correspond roughly to the payments of tax and penalties as set forth by Principal in its January 28, 2005 letter and the table set forth above. However, for 1999 and 2000, the entries purporting to be assessments on May 27, 2005 follow other entries dated June 27, 2005.

In the second set of transcripts dated July 18, 2005, there is an entry for 1999 and 2000 that states "ASED: 05-30-2005." "ASED" apparently stands for "Assessment Statute Expiration Date."

Curiously, the transcripts for 1996, 1997, and 1998 each contain an entry dated April 15, 2005 that shows a "New ASED" of April 14, 2008 and the front page of each of these three transcripts also shows an ASED of April 14, 2008. The relevance of the April 14, 2008 date has not been determined. To the contrary, the "ASED" for these years would appear to be tied to the statute of limitations for the carryback year, 2001, and that statute of limitations would have expired on July 30, 2005. That is the date that is 60 days (per §6503(a)) after the expiration of the 90-day period during which IRS was prohibited from making an assessment by virtue of its statutory notice for 2001 issued on March 1, 2005.

The transcript for 2001 shows an ASED of August 18, 2005. The $1 million of tax for 2001 attributable to the §453A issue was the subject of IRS' statutory notice of deficiency (90-day letter) for 2001 issued on March 1, 2005, and IRS claims that it made a timely assessment of this tax on May 27, 2005. However, the IRS transcript dated July 18, 2005, shows what appears

to be two assessments for 2001 made on June 29, 2005, one for the $1,030,548 tax payment that Principal made on March 29, 2005, and one for what appears to be $184,643 in interest.

## II. Legal Analysis Upon Which Claims For Refund Is Based.

### A. Statutory Provisions.

IRC §6213(a) is the provision that prohibits IRS from making any assessment of tax against Principal for these years during the 90-day period referred to in the statutory notice, and §6503(a) is the provision under which the running of the statute of limitations for making assessments is suspended during the prohibition period and **for a further period of 60 days thereafter**. Therefore, under IRC §6503(a), issuance by IRS of the statutory notice of deficiency for 1999 and 2000 on December 29, 2004 would typically have extended the limitations period for making an assessment for those years (assuming Principal filed no petition in the Tax Court) to May 31, 2005 (60 days after the close of the 90-day suspension period). However, under §6213(b)(4), the prohibition on assessments by IRS came to an end on January 28, 2005, because Principal on that date paid the deficiencies for 1999 and 2000 asserted in the statutory notice. IRS, therefore, could only have made assessments of the asserted deficiencies for those years against Principal for 60 days after January 28, 2005, that is, until March 31, 2005. Therefore, even if the assessments for 1999 and 2000 were made on May 27, 2005, as purportedly shown on the transcripts, they were made after the statute of limitations for those years had expired and Principal is entitled to have all of the remittances for those years refunded.

If the assessments for 1997 and 1998 were made on May 27, 2005, as the July 18, 2005 transcript purports to show, those assessments would have been timely because, notwithstanding the 60-day window IRS had to make assessments for 1999 and 2000 following Principal's payment of taxes on January 28, 2005, the limitations period on assessments for 1996, 1997, and 1998 would not have expired until three years from the date of filing of the return for the carryback year, 2001, that is, until June 24, 2005. IRC §6501(h). Moreover, for the reasons stated in the preceding section, it can be argued that the limitations period for 2001 did not actually expire until July 30, 2005, and if such were the case, an assessment for 1997 and 1998 made on May 27, 2005, and an assessment for 2001 made on June 29, 2005 would have been timely.

Furthermore, even if the foregoing analysis proves correct showing timely assessments for 1997 and 1998, as shown on the second set of IRS transcripts dated July 18, 2005, the assessments would have fallen short in amounts and Principal would still be entitled to refunds as follows:

| Year | Principal's Remittance | Putative Assessment | Refund Due |
|---|---|---|---|
| 1996 | $11,801,071 | -0- | $11,801,071 |
| 1997 | 24,607,313 | $23,727,866 | 879,447 |



104

| | | | |
|---|---|---|---|
| 1998 | 51,304,161 | 45,829,523 | 5,474,638 |
| Total | $87,712,545 | $69,557,389 | $18,155,156 |

**B. Suit For Refund.**

Under IRC §7422(a), a suit for refund may be brought for a tax "illegally assessed or collected" and for any penalty "collected without authority," but only after a claim for refund has first been filed. Such suits may be brought in the Court of Federal Claims under the Tucker Act, 28 U.S.C. §1491, or in federal district court under 28 U.S.C. §1346(a). Section 6402(a) directs that any overpayment shall be refunded, and §6401(a) states that the term **"'overpayment' includes that part of the amount of the payment of an internal revenue tax which is assessed or collected after the expiration of the period of limitation properly applicable thereto."** (Emphasis added.)

Under §§6401 and 7422, Principal may combine its positions on the merits of the issues with its claim that it is entitled to refund because the IRS failed to properly assess the taxes at issue. *Cohen v. U.S.*, 995 F.2d 205 (Fed. Cir. 1993). In the *Cohen* case, the Federal Circuit noted that -

> Plaintiff's position rests on two independent grounds. They claim entitlement to a refund because the IRS failed to timely assess the asserted deficiency for 1980, and even if the assessment had been timely, because the IRS improperly disallowed the losses claimed for 1980.

In *Cohen*, the court held that the taxpayer was entitled to have its payment refunded because the IRS assessment made after the payment was not timely, stating "the chips must lie where they have fallen." *Cohen, supra,* at 209.

In the Supreme Court's seminal decision in *Rosenman v. U.S.*, 323 U.S. 658 (1945), it was held that the date of assessment is the key date as it defines the tax obligation. In *New York Life Ins. Co. v. U.S.*, 118 F.3d 1553 (Fed. Cir. 1997), the Federal Circuit applied both *Rosenman* and *Cohen* to uphold the Court of Federal Claims' decision that the taxpayer was entitled to a refund where no timely assessment by IRS had been made.

The 8th Circuit has also applied *Rosenman* to focus on the date of the assessment as the key date, holding that the 2-year statute of limitations on a claim for refund began on the later date of the assessment, rather than on the earlier date that the remittance was made. *Dubuque Packing Co. v. U.S.*, 233 F.2d 453 (8th Cir. 1956). A district court case in this circuit, like the Federal Circuit in *Cohen*, applied the *Rosenman* rationale to hold that where IRS mailed a notice of deficiency with the limitations period and taxpayer mailed her check for the amount claimed in the notice but the tax was not assessed until after the statute of limitations had expired, the taxpayer was entitled to have the amount of her payment refunded. *Goetz v.U.S.*, 286 F.Supp. 128 (W.D. Mo. 1968).

105

The 5th Circuit has adopted the same "bright-line test" or "*per se*" test as the 8th Circuit, to the effect that whenever the taxpayer has disputed liability for a deficiency, there can be no payment of taxes until there has been a formal assessment. *Thomas v. Mercantile National Bank,* 204 F.2d 943 (5th Cir. 1953). Because "there was no deficiency assessment [until August 17, 1945], and no liability on the part of the taxpayer [despite the revenue agent's proposed deficiency], and consequently nothing to pay . . . the sum deposited . . . on August 2, 1945, was merely an advance deposit to cover additional tax liability expected to arise thereafter." *Id.* at 944. In *Ford v. U.S.*, 618 F.2d 357 (5th Cir. 1980), the 5th Circuit followed its precedent in *Mercantile National Bank.*

III. Conclusion

Because it appears that the Service failed to make timely assessments for tax years 1996, 1997, 1998, 1999, and 2000, Principal requests a refund of $50,172,074 plus interest assessed with respect thereto and statutory interest as allowable by law.