FILED
MAR 6 2008
U.S. COURT OF
FEDERAL CLAIMS

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PRINCIPAL LIFE INSURANCE COMPANY,<br><br>and<br><br>PRINCIPAL FINANCIAL GROUP, INC.<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CIVIL NO. 08-135 T |

APPENDIX III TO PLAINTIFF'S COMPLAINT
(2001)

Bruce Graves
Brown, Winick, Graves, Gross,
Baskerville and Schoenebaum, P.L.C.
666 Grand Avenue, Suite 2000
Des Moines, IA 50309
Phone: 515/242-2400
Fax: 515/283-0231
E-mail: *graves@brownwinick.com*
ATTORNEY FOR PLAINTIFFS
PRINCIPAL LIFE INSURANCE
COMPANY and
PRINCIPAL FINANCIAL GROUP, INC.

# APPENDIX III
# (2001)

## TABLE OF CONTENTS


| TAB | DESCRIPTION | PAGE |
|---|---|---|
| 1 | 2001 Amended Return/Claim for Refund filed January 26, 2007 | 1 |
| 2 | Interest on Deferred Tax Liability | 6 |
| 3 | Foreign Tax Credit – PFG do Brazil | 9 |
| 4 | Foreign Tax Credit – Brazil Prev | 10 |
| 5 | Perpetual Securities | 12 |
| 6 | Custodial Share Receipts | 31 |
| 7 | Amortization of Guaranty Fund Assessments | 56 |
| 8 | Amortization of Termination of Reinsurance Costs | 57 |
| 9 | Bad Debt Deduction | 60 |
| 10 | Whispering Woods LLC | 67 |
| 11 | Whistling Pines LLC | 71 |

# TAB 1

Schedule for 1120PC

PRINCIPAL FINANCIAL GROUP, INC.
f/k/a Principal Mutual Life Insurance Company
711 High Street
Des Moines, IA 50392-0350

EIN 42-1520346

AMENDED RETURN - CLAIM FOR REFUND
Taxable Year 2001

As shown on Amended Return and supporting schedules attached, Taxpayer hereby makes claim for refund in connection with federal income taxes paid, plus deficiency interest paid with respect to the portion of such overpayment paid pursuant to revenue agent's adjustment and subsequent assessment, plus statutory interest. thereon as allowable by law.

The claim which is made as aforesaid, computed as follows:

| | | |
|---|---|---|
| Tax paid with or before filing of original return | $0 | $0 |
| Less: | | |
| Tax paid with 2001 tax audit | $1,030,548 | |
| | $1,030,548 | $1,030,548 |
| Net Tax Paid | | $1,030,548 |
| Tax per line 31, Consolidated 1120 - Claim for Refund | $0 | |
| Correct amount of tax, as computed by taxpayer | | $0 |
| TAX REFUND CLAIM | | ($1,030,548) |

Form **1120** Department of the Treasury Internal Revenue Service

# U.S. Corporation Income Tax Return

For calendar year 2001 or tax year beginning ____ ____, 2001, ending ________, 20 ____

▶ Instructions are separate. See page 20 for Paperwork Reduction Act Notice.

OMB No. 1545-0123

**2001**

A Check if a:
1 Consolidated return (attach Form 851) [X]
2 Personal holding co. (attach Sch. PH) [ ]
3 Personal service corp. (as defined in Temporary Regs. sec. 1.441-4T—see instructions) [ ]

Use IRS label. Otherwise, print or type.
Name, Number, street, and room or suite no. (If a P.O. box, see page 7 of instructions.)
City or town, state, and ZIP code — See Cover Letter
Principal Financial Group, Inc.
711 High Street
Des Moines IA 50392-0350

B Employer identification number: 42-1520346
C Date incorporated: 04/18/2001
D Total assets (see page 8 of instructions): $ 87,026,080,569

E Check applicable boxes: (1) [ ] Initial return (2) [ ] Final return (3) [X] Name change (4) [ ] Address change

CLAIM FOR REFUND

## Income

| Line | Description | | Amount |
|---|---|---|---|
| 1a | Gross receipts or sales 17,603,817,606 b Less returns and allowances 0 c Bal ▶ | 1c | 17,603,817,606 |
| 2 | Cost of goods sold (Schedule A, line 8) | 2 | 915,330 |
| 3 | Gross profit. Subtract line 2 from line 1c | 3 | 17,602,902,276 |
| 4 | Dividends (Schedule C, line 19) | 4 | 251,159,860 |
| 5 | Interest | 5 | 3,894,543,627 |
| 6 | Gross rents | 6 | 366,879,553 |
| 7 | Gross royalties | 7 | 3,590,587 |
| 8 | Capital gain net income (attach Schedule D (Form 1120)) | 8 | 0 |
| 9 | Net gain or (loss) from Form 4797, Part II, line 18 (attach Form 4797) | 9 | 5,139,617 |
| 10 | Other income (see page 8 of instructions–attach schedule) | 10 | 1,667,480,275 |
| 11 | **Total income.** Add lines 3 through 10 ▶ | 11 | 23,791,695,795 |

## Deductions (See instructions for limitations on deductions)

| Line | Description | | Amount |
|---|---|---|---|
| 12 | Compensation of officers (Schedule E, line 4) | 12 | 0 |
| 13 | Salaries and wages (less employment credits) | 13 | 928,002,943 |
| 14 | Repairs and maintenance | 14 | 992,632 |
| 15 | Bad debts | 15 | 8,562,680 |
| 16 | Rents | 16 | 95,015,174 |
| 17 | Taxes and licenses | 17 | 169,321,070 |
| 18 | Interest | 18 | 590,877,849 |
| 19 | Charitable contributions (see page 10 of instructions for 10% limitation) | 19 | 0 |
| 20 | Depreciation (attach Form 4562) — 20: 75,406,217 | | |
| 21 | Less depreciation claimed on Schedule A and elsewhere on return — 21a: 0 | 21b | 75,406,217 |
| 22 | Depletion | 22 | 0 |
| 23 | Advertising | 23 | 87,494,413 |
| 24 | Pension, profit-sharing, etc., plans | 24 | 6,484,506 |
| 25 | Employee benefit programs | 25 | 83,355,745 |
| 26 | Other deductions (attach schedule) | 26 | 21,947,757,864 |
| 27 | **Total deductions.** Add lines 12 through 26 ▶ | 27 | 23,993,271,093 |
| 28 | Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11 | 28 | -201,575,298 |
| 29 | **Less:** a Net operating loss (NOL) deduction (see page 13 of instructions) — 29a: 0 | | |
| | b Special deductions (Schedule C, line 20) — 29b: 146,211,122 | 29c | 146,211,122 |

## Tax and Payments

| Line | Description | | Amount |
|---|---|---|---|
| 30 | **Taxable income.** Subtract line 29c from line 28 | 30 | -347,786,420 |
| 31 | **Total tax** (Schedule J, line 11) | 31 | 0 |
| 32 | **Payments:** a 2000 overpayment credited to 2001 — 32a: 0 | | |
| | b 2001 estimated tax payments — 32b: 0 | | |
| | c Less 2001 refund applied for on Form 4466 — 32c: ( 0 ) d Bal ▶ 32d: 0 (See attached schedule) | | |
| | e ~~Tax deposited with Form 7004~~ XXXXXXXXXXXXXXXXXXXXXXXXX Tax paid at audit — 32e: 1,030,548 | | |
| | f Credit for tax paid on undistributed capital gains (attach Form 2439) — 32f: 0 | | |
| | g Credit for Federal tax on fuels (attach Form 4136). See instructions — 32g: 0 | 32h | 1,030,548 |
| 33 | Estimated tax penalty (see page 14 of instructions). Check if Form 2220 is attached ▶ [ ] | 33 | 0 |
| 34 | **Tax due.** If line 32h is smaller than the total of lines 31 and 33, enter amount owed | 34 | 0 |
| 35 | **Overpayment.** If line 32h is larger than the total of lines 31 and 33, enter amount overpaid | 35 | 1,030,548 |
| 36 | Enter amount of line 35 you want: **Credited to 2002 estimated tax** ▶ 0 **Refunded** ▶ | 36 | 1,030,548 |

**Sign Here** — Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer: Lillian Chen (signed) — Date: 1/25/07 — Title: Vice President Tax

May the IRS discuss this return with the preparer shown below (see instr.)? [ ] Yes [ ] No

**Paid Preparer's Use Only** — Preparer's signature: ___ Date: ___ Check if self-employed [ ] Preparer's SSN or PTIN: ___
Firm's name (or yours if self-employed) address, and ZIP code: ___ EIN: ___ Phone no.: ___

Copyright(c) 2001 Deloitte & Touche Tax Technologies LLC
ERF



02

## Schedule A Cost of Goods Sold (See page 14 of instructions.)

| | | | |
|---|---|---|---|
| 1 | Inventory at beginning of year | 1 | 0 |
| 2 | Purchases | 2 | 0 |
| 3 | Cost of labor | 3 | 0 |
| 4 | Additional section 263A costs (attach schedule) | 4 | 0 |
| 5 | Other costs (attach schedule) | 5 | 915,330 |
| 6 | **Total.** Add lines 1 through 5 | 6 | 915,330 |
| 7 | Inventory at end of year | 7 | 0 |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on line 2, page 1 | 8 | 915,330 |

9a Check all methods used for valuing closing inventory:

(i) ☐ Cost as described in Regulations section 1.471-3

(ii) ☐ Lower of cost or market as described in Regulations section 1.471-4

(iii) ☐ Other (Specify method used and attach explanation.) ▶

b Check if there was a writedown of subnormal goods as described in Regulations section 1.471-2(c) ▶ ☐

c Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) ▶ ☐

d If the LIFO inventory method was used for this tax year, enter percentage (or amounts) of closing inventory computed under LIFO | 9d |

e If property is produced or acquired for resale, do the rules of section 263A apply to the corporation? ☐ Yes ☐ No

f Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If "Yes," attach explanation ☐ Yes ☐ No

## Schedule C Dividends and Special Deductions (See page 15 of instructions.)

| | | (a) Dividends received | (b) % | (c) Special deductions (a) x (b) |
|---|---|---|---|---|
| 1 | Dividends from less-than-20%-owned domestic corporations that are subject to the 70% deduction (other than debt-financed stock) | 208,873,031 | 70 | 146,211,122 |
| 2 | Dividends from 20%-or-more-owned domestic corporations that are subject to the 80% deduction (other than debt-financed stock) | 0 | 80 | 0 |
| 3 | Dividends on debt-financed stock of domestic and foreign corporations (section 246A) | 0 | see instructions | 0 |
| 4 | Dividends on certain preferred stock of less-than-20%-owned public utilities | 0 | 42 | 0 |
| 5 | Dividends on certain preferred stock of 20%-or-more-owned public utilities | 0 | 48 | 0 |
| 6 | Dividends from less-than-20%-owned foreign corporations and certain FSCs that are subject to the 70% deduction | 0 | 70 | 0 |
| 7 | Dividends from 20%-or-more-owned foreign corporations and certain FSCs that are subject to the 80% deduction | 0 | 80 | 0 |
| 8 | Dividends from wholly owned foreign subsidiaries subject to the 100% deduction (section 245(b)) | 0 | 100 | 0 |
| 9 | **Total.** Add lines 1 through 8. See page 16 of instructions for limitation | | | 146,211,122 |
| 10 | Dividends from domestic corporations received by a small business investment company operating under the Small Business Investment Act of 1958 | 0 | 100 | 0 |
| 11 | Dividends from certain FSCs that are subject to the 100% deduction (section 245(c)(1)) | 0 | 100 | 0 |
| 12 | Dividends from affiliated group members subject to the 100% deduction (section 243(a)(3)) | 0 | 100 | 0 |
| 13 | Other dividends from foreign corporations not included on lines 3, 6, 7, 8, or 11 | 19,130,949 | | |
| 14 | Income from controlled foreign corporations under subpart F (attach Form(s) 5471) | 6,424,934 | | |
| 15 | Foreign dividend gross-up (section 78) | 9,342,955 | | |
| 16 | IC-DISC and former DISC dividends not included on lines 1, 2, or 3 (section 246(d)) | 0 | | |
| 17 | Other dividends | 7,387,991 | | |
| 18 | Deduction for dividends paid on certain preferred stock of public utilities | | | 0 |
| 19 | **Total dividends.** Add lines 1 through 17. Enter here and on line 4, page 1 ▶ | 251,159,860 | | |
| 20 | **Total special deductions.** Add lines 9, 10, 11, 12, and 18. Enter here and on line 29b, page 1 ▶ | | | 146,211,122 |

## Schedule E Compensation of Officers (See instructions for line 12, page 1.)

**Note:** Complete Schedule E only if total receipts (line 1a plus lines 4 through 10 on page 1, Form 1120) are $500,000 or more.

| (a) Name of officer | (b) Social security number | (c) Percent of time devoted to business | Percent of corporation stock owned (d) Common | (e) Preferred | (f) Amount of compensation |
|---|---|---|---|---|---|
| 1 Available on Request | | % | % | % | 0 |
| | | % | % | % | 0 |
| | | % | % | % | 0 |
| | | % | % | % | 0 |
| | | % | % | % | 0 |

| | | |
|---|---|---|
| 2 | Total compensation of officers | 0 |
| 3 | Compensation of officers claimed on Schedule A and elsewhere on return | 0 |
| 4 | Subtract line 3 from line 2. Enter the result here and on line 12, page 1 | 0 |

03

**Schedule J** **Tax Computation** (See page 16 of instructions.)

| Line | Description | | Amount |
|---|---|---|---|
| 1 | Check if the corporation is a member of a controlled group (see sections 1561 and 1563) ▶ [X] **Important:** Members of a controlled group, see instructions on page 16. | | |
| 2a | If the box on line 1 is checked, enter the corporation's share of the $50,000, $25,000, and $9,925,000 taxable income brackets (in that order): (1) $ 0 (2) $ 0 (3) $ 0 | | |
| b | Enter the corporation's share of: (1) Additional 5% tax (not more than $11,750) $ 0; (2) Additional 3% tax (not more than $100,000) $ 0 | | |
| 3 | Income tax. Check if a qualified personal service corporation under section 448(d)(2) (see page 17) ▶ [ ] | 3 | 0 |
| 4 | Alternative minimum tax (attach Form 4626) | 4 | 0 |
| 5 | Add lines 3 and 4 | 5 | 0 |
| 6a | Foreign tax credit (attach Form 1118) — 6a: 0 | | See attached Schedule |
| b | Possessions tax credit (attach Form 5735) — 6b: 0 | | |
| c | Check: [ ] Nonconventional source fuel credit [ ] QEV credit (attach Form 8834) — 6c: 0 | | |
| d | General business credit. Check box(es) and indicate which forms are attached. [ ] Form 3800 [X] Form(s) (specify) ▶ Form 8586 — 6d: 0 | | |
| e | Credit for prior year minimum tax (attach Form 8827) — 6e: 0 | | |
| f | Qualified zone academy bond credit (attach Form 8860) — 6f: 0 | | |
| 7 | **Total credits.** Add lines 6a through 6f | 7 | 0 |
| 8 | Subtract line 7 from 5 | 8 | 0 |
| 9 | Personal holding company tax (attach Schedule PH (Form 1120)) | 9 | 0 |
| 10 | Recapture taxes. Check if from: [ ] Form 4255 [ ] Form 8611 [ ] Form 8697 [ ] Form 8866 [ ] Other (attach schedule) | 10 | 0 |
| 11 | **Total tax.** Add lines 8 through 10. Enter here and on line 31, page 1 . . . 0 | 11 | 0 |

**Schedule K** **Other Information** (See page 19 of instructions.)

| No. | Question | Yes | No |
|---|---|---|---|
| 1 | Check method of accounting: a [ ] Cash b [X] Accrual c [ ] Other (specify) ▶ | | |
| 2 | See page 21 of the instructions and enter the: a Business activity code no. ▶ 551112; b Business activity ▶ Financial Services; c Product or service ▶ Financial Services | | |
| 3 | At the end of the tax year, did the corporation own, directly or indirectly, 50% or more of the voting stock of a domestic corporation? (For rules of attribution, see section 267(c).) If "Yes," attach a schedule showing: (a) name and employer identification number (EIN), (b) percentage owned, and (c) taxable income or (loss) before NOL and special deductions of such corporation for the tax year ending with or within your tax year. | X | |
| 4 | Is the corporation a subsidiary in an affiliated group or a parent-subsidiary controlled group? If "Yes," enter name and EIN of the parent corporation ▶ | | X |
| 5 | At the end of the tax year, did any individual, partnership, corporation, estate or trust own, directly or indirectly, 50% or more of the corporation's voting stock? (For rules of attribution, see section 267(c).) If "Yes," attach a schedule showing name and identifying number. (Do not include any information already entered in 4 above.) Enter percentage owned ▶ | | X |
| 6 | During this tax year, did the corporation pay dividends (other than stock dividends and distributions in exchange for stock) in excess of the corporation's current and accumulated earnings and profits? (See sections 301 and 316.) If "Yes," file **Form 5452**, Corporate Report of Nondividend Distributions. If this is a consolidated return, answer here for the parent corporation and on **Form 851**, Affiliations Schedule, for each subsidiary. | | X |
| 7 | At any time during the tax year, did one foreign person own, directly or indirectly, at least 25% of (a) the total voting power of all classes of stock of the corporation entitled to vote or (b) the total value of all classes of stock of the corporation? If "Yes," a Enter percentage owned ▶ b Enter owner's country ▶ c The corporation may have to file **Form 5472**, Information Return of a 25% Foreign-Owned U.S. Corporation or a Foreign Corporation Engaged in a U.S. Trade or Business. Enter number of Forms 5472 attached. ▶ | | X |
| 8 | Check this box if the corporation issued publicly offered debt instruments with original issue discount ▶ [ ] If checked, the corporation may have to file **Form 8281**, Information Return for Publicly Offered Original Issue discount Instruments. | | |
| 9 | Enter the amount of tax-exempt interest received or accrued during the tax year ▶ $ 13,031,920 | | |
| 10 | Enter the number of shareholders at the end of the tax year (if 75 or fewer) ▶ | | |
| 11 | If the corporation has an NOL for the tax year and is electing to forego the carryback period, check here ▶ [ ] If the corporation is filing a consol. return, the statement required by Reg. sec. 1.1502-21(b)(3)(i) and (ii) must be attached or the election will not be valid. | | |
| 12 | Enter the available NOL carryover from prior tax years (Do not reduce it by any deduction on line 29a.) ▶ $ 0 | | |

**Note:** If the corporation, at any time during the tax year, had assets or operates a business in a foreign country or U.S. possession it may be required to attach **Schedule N (Form 1120),** Foreign Operations of U.S. Corporations, to this return. See Schedule N for details.

04



Copyright(c) 2001 Deloitte & Touche Tax Technologies LLC

CLAIM FOR REFUND

Form 1120 (2001) Principal Financial Group, Inc. 42-1520346 Page 4

## Schedule L Balance Sheets per Books

| Assets | | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|---|
| 1 | Cash | | 919,422,046 | | 573,400,352 |
| 2a | Trade notes and accounts receivable | 2,681,091,504 | | 2,523,264,468 | |
| b | Less allowance for bad debts | ( 3,919,185 ) | 2,677,172,319 | ( 5,450,826 ) | 2,517,813,642 |
| 3 | Inventories | | 0 | | 0 |
| 4 | U.S. government obligations | | 0 | | 748,187 |
| 5 | Tax-exempt securities (see instructions) | | 0 | | 0 |
| 6 | Other current assets (attach schedule) | | 4,479,979,102 | | 6,019,149,191 |
| 7 | Loans to stockholders | | 0 | | 0 |
| 8 | Mortgage and real estate loans | | 10,053,809,172 | | 8,685,892,119 |
| 9 | Other investments (attach schedule) | | 60,073,262,901 | | 64,673,541,209 |
| 10a | Buildings and other depreciable assets | 2,388,530,664 | | 1,878,905,587 | |
| b | Less accumulated depreciation | ( 160,985,718 ) | 2,227,544,946 | ( 74,865,081 ) | 1,804,040,506 |
| 11a | Depletable assets | 0 | | 0 | |
| b | Less accumulated depletion | ( 0 ) | 0 | ( 0 ) | 0 |
| 12 | Land (net of any amortization) | | 13,119,227 | | 1,227,300 |
| 13a | Intangible assets (amortizable only) | 1,267,777,197 | | 1,950,831,555 | |
| b | Less accumulated amortization | ( 48,913,373 ) | 1,218,863,824 | ( 62,250,395 ) | 1,888,581,160 |
| 14 | Other assets (attach schedule) | | 1,108,114,715 | | 861,686,903 |
| 15 | Total assets | | 82,771,288,252 | | 87,026,080,569 |
| | **Liabilities and Stockholders' Equity** | | | | |
| 16 | Accounts payable | | 302,707,396 | | 360,767,602 |
| 17 | Mortgages, notes, bonds payable in less than 1 year | | 2,498,768,593 | | 1,503,462,518 |
| 18 | Other current liabilities (attach schedule) | | 73,663,579,961 | | 77,319,774,825 |
| 19 | Loans from shareholders | | 0 | | 0 |
| 20 | Mortgages, notes, bonds payable in 1 year or more | | 1,021,818,950 | | 196,670,197 |
| 21 | Other liabilities (attach schedule) | | 1,157,974,048 | | 1,496,422,845 |
| 22 | Capital stock: a Preferred stock | 0 | | 0 | |
| | b Common stock | 0 | 0 | 3,758,000 | 3,758,000 |
| 23 | Additional paid-in capital | | 0 | | 7,072,500,000 |
| 24 | Retained earnings--Appropriated (attach schedule) | | 113,734,649 | | 108,309,463 |
| 25 | Retained earnings --Unappropriated | | 4,027,268,434 | | -817,260,897 |
| 26 | Adjustments to shareholders' equity (attach schedule) | | -13,353,011 | | 157,334,872 |
| 27 | Less cost of treasury stock | | ( 1,210,768 ) | | ( 375,658,885 ) |
| 28 | Total liabilities and stockholders' equity | | 82,771,288,252 | | 87,026,080,540 |

**Note:** The corporation is not required to complete Schedules M-1 and M-2 if the total assets on line 15, col. (d) of Schedule L are less than $25,000.

## Schedule M-1 Reconciliation of Income (Loss) per Books With Income per Return (See page 20 of instructions.)

| | | | | | |
|---|---|---|---|---|---|
| 1 | Net income (loss) per books | -550,482,959 | 7 | Income recorded on books this year not included on this return (itemize): Tax-exempt interest $ 13,031,920 | |
| 2 | Federal income tax | -27,031,626 | | -2,961,284,530 | -2,948,252,610 |
| 3 | Excess of capital losses over capital gains | 514,896,704 | 8 | Deductions on this return not charged against book income this year (itemize): | |
| 4 | Income subject to tax not recorded on books this year (itemize): | 95,372,731 | | a Depreciation $ 11,831,971 | |
| 5 | Expenses recorded on books this year not deducted on this return (itemize): | | | b Charitable contributions $ 0 | |
| a | Depreciation $ 0 | | | 0 | |
| b | Charitable contributions $ 22,991 | | | 791,632,428 | 803,464,399 |
| c | Travel and entertainment $ 2,308,363 | | | | |
| | 0 | | | | |
| | -2,381,449,713 | -2,379,118,359 | 9 | Add lines 7 and 8 | -2,144,788,211 |
| 6 | Add lines 1 through 5 | -2,346,363,509 | 10 | Income (line 28, page 1)-line 6 less line 9 | -201,575,298 |

## Schedule M-2 Analysis of Unappropriated Retained Earnings per Books (Line 25, Schedule L)

| | | | | | |
|---|---|---|---|---|---|
| 1 | Balance at beginning of year | 4,027,268,448 | 5 | Distributions: a Cash | 0 |
| 2 | Net income (loss) per books | -550,482,960 | | b Stock | 0 |
| 3 | Other increases (itemize): | | | c Property | 0 |
| | | | 6 | Other decreases (itemize): | 177,106,120 |
| | | -4,116,940,265 | 7 | Add lines 5 and 6 | 177,106,120 |
| 4 | Add lines 1, 2, and 3 | -640,154,777 | 8 | Balance at end of year (line 4 less line 7) | -817,260,897 |

05

Copyright(c) 2001 Deloitte & Touche Tax Technologies LLC

# TAB 2

**PRINCIPAL LIFE INSURANCE COMPANY**
**TAX YEAR 2001**
**$1,030,548**

## CODE SECTION 453A - INTEREST ON DEFERRED TAX LIABILITY

Taxpayer claims refund based on removal of additional tax attributable to the interest on a deferred tax liability on an installment sale under section 453A of the Code. Upon audit, the examining agent assessed additional tax attributable to the interest on the deferred tax liability on an installment sale. For the reasons set forth below section 453A is inapplicable to this transaction and the additional tax should be refunded.

### FACTS

On December 20, 1991, Principal Life Insurance Company ("Principal Life") sold commercial mortgage loans to Prudential Insurance Company of America ("Prudential") and deferred the gain realized under the installment sale provisions of Section 453. On December 23, 1991, Principal Life sold the installment notes to a wholly owned subsidiary, Principal FC, Ltd., triggering the deferred gains under section 453B. The examining agent proposed computing interest under section 453A on the deferred tax liability arising from the installment sale of the commercial mortgage loans to Prudential on December 20, 1991 and assessed additional tax related to that interest. Principal Life disagrees with this adjustment and makes this claim for refund.

### ANALYSIS

In the agent's notice of proposed adjustments, he stated that even though the installment obligation was sold in a deferred intercompany transaction, it remained an obligation subject to section 453A. Under IRC §453A(b), section 453A applies only to installment obligations that are outstanding at the close of a taxable year and only if all of such obligations exceed $5,000,000. It further provides that all members of the same controlled group are treated as one person for the purposes of determining whether section 453A applies. Under section 453B, however, the disposition of the installment sale obligation to Principal FC, Ltd., precludes the application of section 453A to this transaction.

Section 453B(a) provides that:

> If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and -

(1) the amount realized, in the case of satisfaction other than face value or sale or exchange, or

(2) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

Under section 453B when Principal Life sold the installment obligation to Principal FC, Ltd., the deferred gain was triggered, Principal Life was no longer the owner of an installment obligation and Principal FC became the holder of a note receivable. Section 453A only applies to installment obligations. Because the obligation in the hands of Principal FC, Ltd., is a note receivable, the fact that Principal Life and Principal FC, Ltd., are treated as one person is irrelevant because the obligation is no longer one falling within the definition of an installment obligation to which section 453A applies.

The deferred gain which Principal Life would have recognized under section 453B continues to be deferred under Treasury Regulation section 1.1502-13 as the sale to the subsidiary constitutes a deferred intercompany transaction and will be recognized as the payments are received by Principal FC, Ltd., from Prudential. Treasury Regulation section 1.1502-13(e)(1) states:

> If an installment obligation (within the meaning of section 453(d)) is transferred in a deferred intercompany transaction, then on each date on which the obligation is satisfied the selling member shall take into account an amount equal to the deferred gain or loss on such transfer, multiplied by a fraction, the numerator of which is the portion of such obligation satisfied on such date, and the denominator of which is the aggregate unpaid installments immediately after the deferred intercompany transaction.

The examining agent cited to Treasury Regulation section 1.1502-13(m)(3), example 2, item (iii), in support of the application of section 453A to this transaction. This example is not helpful in our situation, as it involves a different set of facts. In the example, a subsidiary sells property to its parent company which then sells the property to an unrelated third party in return for an installment obligation over $5 million, causing section 453A to be applied. In the transaction at issue, Principal Life received an

installment obligation from a third party which it then sold to its subsidiary in a transaction in which gain would have been recognized but for the intercompany transaction rules, which cause the gain to continue to be deferred. In example 2, the sale is from the control group to an outside party whereas in this case the installment sale occurs between the outside party and Principal Life and the obligation is then sold by Principal Life to its subsidiary. The taxpayer does not understand why the result should differ.

That section 453A is inapplicable to the current situation is further shown by final regulations under section 1502, which were issued on July 12, 1995, to address the specific issue in question. Under Treasury Regulation section 1.1502-13(m), Example 6, section 453A is made applicable to transactions such as the present situation occurring on or after July 12, 1995. The issuance of these regulations further amplifies that at the time of this transaction, section 453A was not applicable to the transaction and the examining agent's application of section 453A to the transaction is incorrect. If section 453A was applicable to the present situation in 1992 and 1993, there would have been no reason to issue the new regulations.

CONCLUSION

Neither section 453A nor then current Treasury Regulation section 1.1502-13 provides any basis for applying the interest charge on the sale of installment obligations to Principal FC, Ltd. Section 453A contains a single employer rule designed to consolidate all qualified installment obligations held by consolidated members for purposes of the $5,000,000 threshold, but is inapplicable where the installment obligation has been sold and the gain triggered under section 453B. The intercompany transaction regulations in effect at that time provided for the restoration of gain from the intercompany sale of the installment obligations but provided only a limited application of section 453A in a factual situation not applicable to Principal Life. It was not until final regulations were issued under section 1502 that the application of section 453A was broadened to include the type of transaction Principal Life executed in 1991. These regulations, however, are generally effective for transactions occurring in tax years beginning on or after July 12, 1995. Because section 453A is clearly inapplicable to this transaction, Taxpayer hereby requests a refund of $1,030,548 for tax year 2001 based upon removal of the additional tax arising from the interest on the deferred tax on the installment sale under section 453A of the Code.

RECENT COURT CASE

On March 17, 2006, the United States Court of Federal Claims, *Principal Life Insurance Company v. United States*, 70 Fed. Cl. 144 (2006), held that the transaction that is the subject of this refund claim was a true sale and that section 453B applied. Accordingly, the interest charged pursuant to section 453A(c) is inapplicable. It is unclear whether the government will appeal this decision.

# TAB 3

Principal Life Insurance Company

Tax Year 2001

$75,754

Direct Foreign Tax Credit

**Facts**

As a Brazilian company, PFG Do Brasil LTDA elected to be treated as a disregarded entity for U.S. tax purposes, PFG Do Brasil LTDA, is taxed in Brazil as well as the U.S. The foreign tax credit claimed for PFG Do Brasil was calculated with the best information available at the time the returns were filed. Because Brazilian tax returns were not available when the returns were filed, the direct foreign tax credit was estimated based on the dividend paid to PFG Do Brasil and the Brazilian tax rate. Based on the tax returns filed by PFG Do Brazil, Taxpayer proposes the following U.S. dollar adjustments to the direct foreign tax credit paid by PFG Do Brazil. Please note that the foreign tax credits both before and after the audit adjustment are the total available credits and do not consider any potential limitation of credit in the respective basket, if any:

**Law**

IRC Section 901 allows a foreign tax credit for the Brazilian income taxes paid by PFG Do Brasil.

| Year | USD FTC as Filed-Fin Svc Bskt | USD Actual FTC | USD Adj to Direct FTC |
|---|---|---|---|
| 1999 | 0 | 69,785 | 69,785 |
| 2000 | 416,764 | 387,083 | (29,681) |
| 2001 | 231,852 | 348,397 | 116,545 |
| **Total Increase to Direct Foreign Tax Credit** | | | **156,649** |

An equal increase would be made to taxable income for the add back of direct 901 taxes expensed.

This also results in the following U.S. dollar taxable income increase:

| Year | Sec 901 Gross Up as Filed | Actual Gross Up | USD Adj Taxable Income |
|---|---|---|---|
| 1999 | 0 | 69,785 | 69,785 |
| 2000 | 211,849 | 387,083 | 175,234 |
| 2001 | 166,296 | 348,397 | 182,101 |
| **Total Increase to Taxable Income** | | | **427,120** |

Accordingly, Principal Life Insurance Company requests a refund of $75,754.

# TAB 4

Principal Life Insurance Company

Tax year 2001

$197,233

Indirect Foreign Tax Credit

**Please note that all amounts are consistent with the indirect foreign tax credits for 1999-2001 used to calculate the 2002 & 2003 tax pools and tax credits per the 5701 for those years.**

**Facts**

When the BrasilPrev historical earnings and profits and tax pools were computed for 1999-2002, they were done incorrectly. Taxpayer did not discover this error until after the 2002 tax return was filed.

BrasilPrev did not make a distribution during our ownership in 1999. In 2000 and 2001, BrasilPrev did make a distribution to PFG Do Brasil. In addition to adjustment of dividends paid in each year, the incorrect historical E&P and tax pools were utilized as part of the calculation to determine the indirect foreign tax credit paid with the dividend.

This results in the following U.S. dollar foreign tax credit (decrease) increase respectively to the 1999, 2000 and 2001 Sec. 902 Basket – BrasilPrev. Please note that the foreign tax credits both before and after the audit adjustment are the total available credits and do not consider any potential limitation of credit in the respective basket, if any.

| Year | USD FTC as Filed-902 Bskt | USD Actual FTC | USD Adj to Indirect FTC |
|---|---|---|---|
| 1999 | 333,191 | 0 | (333,191) |
| 2000 | 45,412 | 266,773 | 221,361 |
| 2001 | 75,055 | 378,490 | 303,435 |
| **Total Increase to Indirect Foreign Tax Credit** | | | **191,605** |

This also results in the following U.S. dollar taxable income (decrease) increase (section 78 gross up):

| Year | Sec 78 Gross Up as Filed | Actual Gross Up | USD Adj Taxable Income |
|---|---|---|---|
| 1999 | 0 | 0 | 0 |
| 2000 | 45,412 | 266,773 | 221,361 |
| 2001 | 75,055 | 378,490 | 303,435 |
| **Total Increase to Taxable Income** | | | **524,796** |

**Law**

Section 902(c) splits earnings and profits and taxes into two groups: pre-1987 and post-1986. Post -1986 undistributed earnings and foreign taxes include only those periods (after 1986) beginning on or after the first day of the first taxable year in which a

domestic corporation owns 10% or more of the voting stock of the foreign corporation. E&P and taxes prior to this time are deemed to be pre-1987 and are treated as E&P and tax maintained in layers to be accessed on a LIFO basis and are not included in the post-1986 pools.

Accordingly, Principal Life Insurance Company requests a refund of $197,233.

# TAB 5

PRINCIPAL LIFE INSURANCE COMPANY

CLAIM FOR REFUND

PERPETUAL SECURITIES ISSUE

2001 - Capital Loss - $73,734,045

Taxpayer claims refund of tax, penalties, and interest attributable to the Internal Revenue Service's improper disallowance of capital losses in 2000 resulting from Taxpayer's sale of Evergreen and Seve Principal Certificates in 2001, as more fully described below and in the Internal Revenue Service National Office Technical Advice Memorandum issued with respect to the Taxpayer on August 20, 2004, which is incorporated herein by reference.

I. Facts Upon Which Claim For Refund Is Based.

The transactions at issue involve Principal Life Insurance Company's ("Principal Life" or the "Taxpayer") purchase of Perpetual Securities followed by contribution of such securities to trustees of trusts in 2000 and 2001 in return for Interest Certificates and Principal Certificates issued by the trusts, and the subsequent sale of the Principal Certificates to an unrelated purchaser.

A. Business Context Of The Transactions.

The Taxpayer is a stock insurance company and indirect subsidiary of Principal Financial Group, Inc., a public company. The Taxpayer was formerly known as the Principal Mutual Life Insurance Company and is the largest member company in a family of companies known since 1985 as the Principal Financial Group. It is one of the largest insurance companies domiciled in the United States.

As part of its business, the Taxpayer issues insurance policies and annuity contracts in return for its promise to pay death or annuity benefits to the policy owner or named beneficiary. Most policies and contracts can be surrendered at the option of the owner for the accumulated surrender value or other amounts guaranteed under the contract. Thus, the Taxpayer is at risk at any time for certain described surrender values or other contractually-guaranteed payments

Under a deferred annuity contract, for example, a customer can make deposits into his contract over time. The customer can choose at any time to withdraw all or part of the funds on deposit with the Taxpayer or annuitize part or all of the contract. If annuitized, the Taxpayer must make monthly or quarterly payments of a set amount to the customer over a certain period of time, for his life, or for the life of the owner and one or more named beneficiaries. Prior to annuitization, the investment risk relating to the funds deposited could have been retained by the customer, if the contract is a variable annuity, or assumed by the Taxpayer, if the contract is a fixed annuity providing guaranteed returns. The Taxpayer, like other insurance companies, relies on actuarial science and modeling techniques to predict the actions of customers and the

12

need for cash to fulfill its obligations under the various policies and contracts it issues. These models are subjected to continual testing and modification as new information is obtained and new techniques developed.

1. Asset/Liability Matching.

The Taxpayer is required by the states in which it is licensed to manage its assets and liabilities so as to have sufficient liquid assets to cover the risks of surrenders and sufficient assets to cover the expected death benefits, annuity payments, and other obligations set forth in the policies and contracts. Taxpayer's business, therefore, is to invest the funds it receives from customers in order to provide sufficient returns to cover the liabilities (promises) created by the products the Taxpayer sells. The Taxpayer is subject to regulatory action (e.g., penalties) if its investment policies and procedures do not provide for adequate returns.

One of the ways the Taxpayer has chosen to meet its investment obligations is to segment its general account. This accounting procedure requires the Taxpayer to assign its products to different segments, based on the cash flows for those products and the expected liability flows over time. Under asset-liability matching ("ALM"), the assets and liabilities of each segment are separately tested to ensure that the assets and their expected cash flows meet the expected cash flow requirements of the liabilities arising under the policies or contracts.

To meet the ALM requirement, as well as other regulatory, rating agency, and GAAP requirements to which it is subject, the Taxpayer has a rigorous risk-management function. This function reviews liquidity, credit, diversification, interest rate, currency, and optionality in individual positions as well as the portfolio in the aggregate. This risk management process is integral to the Taxpayer's investment operations when it is evaluating individual asset purchases.

2. Taxpayer's Evolving Investment Objectives And Strategy.

Over the last 50 years, Taxpayer has developed significant expertise analyzing and investing in the commercial mortgage market. Although considered less liquid and more risky than other types of investments such as corporate bonds, commercial mortgages have traditionally provided Taxpayer with higher portfolio yields and more attractive intermediate-term cash flows than bonds. These intermediate-term cash flows are important to Taxpayer because they match up well with the contractual cash flows required under many of Taxpayer's liabilities. The ability to successfully underwrite and manage commercial mortgages has provided Taxpayer with a significant business advantage over its competitors.

During 1998, the commercial mortgage loan market became less attractive for several reasons. First, the market began to experience a weakening of credit quality, causing a decline in risk-adjusted returns. Second, Taxpayer was under pressure by the rating agencies to reduce its exposure to real estate and to improve the appearance of its balance sheet in anticipation of becoming a publicly traded company. As a result of these factors, Taxpayer began to allocate more of its cash flow to lower-yielding public corporate bonds. This put increased pressure on asset yields and Taxpayer's ALM plan because public corporate bonds were not generally

available in sufficient quantity to provide the intermediate-term cash flows needed by Taxpayer. As a result, Taxpayer began to look for alternatives to mortgage loans that (1) would not be treated as real estate by the rating agencies; (2) would provide higher yields than public corporate bonds; and (3) would provide the necessary intermediate-term cash flows.

This proved to be difficult since there was no large supply of assets in the intermediate-term cash flow range that were attractively priced. Taxpayer considered Treasury, money market, and single name corporate bond interest-only strips but rejected these alternatives primarily because of low cash-on-cash yields, sometimes even lower than Taxpayer's cost of funds. Very few primary issues existed. Most of the assets had to be acquired on the secondary market, which did not provide the sufficient quantity needed.

Consequently, Taxpayer decided to acquire a portfolio of Perpetual Securities in the hope of executing one or more cash-flow separation transactions to create the intermediate-term cash flows needed. Taxpayer concluded that moving down the capital structure of a highly-rated and highly-regulated bank provided better relative value than selecting a lower-rated credit and moving up the capital structure to more senior securities. The perpetual security market is a thinly traded market and provides a liquidity premium to organizations with the contacts and capabilities to assess the risks. Working with Morgan Stanley, Taxpayer was able to acquire a portfolio of Perpetual Securities and created a stream of high quality, significantly yielding cash flows that helped meet Taxpayer's need for intermediate-term cash flows.

In addition to matching cash flows from assets and liabilities, Taxpayer also used the perpetual Interest Certificates to help manage a "duration" mismatch between Taxpayer's assets and liabilities. Duration is a concept separate from cash flow matching and is an important tool used by insurance companies to manage the market value sensitivity of assets relative to liabilities due to fluctuations in market interest rates.

Duration refers to how price sensitive a financial instrument (asset or liability) is to changes in market interest rates. Fixed rate instruments have positive duration, meaning that their market value moves in the opposite direction of market interest rates. Thus, if market interest rates rise, the value of a fixed rate instrument will fall. The further out the fixed contractual cash flows are, the greater the financial instrument's price sensitivity to movements in market interest rates. For example, a ten-year zero-coupon U.S. Treasury that has all of its cash flows back-loaded at maturity will be more price sensitive than a fixed rate amortizing mortgage loan that pays its cash flows out over time. By matching the duration of its assets with the duration of its liabilities, Taxpayer ensures that the value of its equity remains relatively stable no matter which way interest rates change.

Floating rate instruments, such as money market mutual funds, have virtually no duration (or price sensitivity) because their periodic cash flows are regularly reset to current market rates. These instruments will usually trade at or near their face value. Floating rate interest-only certificates, such as the perpetual Interest Certificates, have *negative* duration, meaning that their value moves in the *same* direction as market interest rates. Thus, if market interest rates rise,

cash flow received on the perpetual Interest Certificates will also rise, making the perpetual Interest Certificates more valuable to their holders.

At the time the first perpetual security transaction was executed, the duration mismatch between Taxpayer's assets and liabilities on a portfolio basis was outside of Taxpayer's acceptable tolerances. In particular, Taxpayer's assets had greater positive duration than Taxpayer's liabilities. By selling the Principal Certificates and retaining the Interest Certificates, Taxpayer was able to add cash flows with negative duration to its asset portfolio. This had the effect of reducing the sensitivity of Taxpayer's asset portfolio to changes in interest rates, bringing it more in line with Taxpayer's liabilities. This was an advantage the perpetual Interest Certificates had over mortgage loans which have positive duration and would not have been of any benefit in addressing this portfolio duration mismatch.

B. <u>The Perpetual Securities Transactions.</u>

The Taxpayer entered into the first of the three transactions (the "Asgard transaction") in October, 2000. That transaction involved Perpetual Securities with a face value of $120 million. The Taxpayer entered into similar but independent transactions in April, 2001 (the "Seve transaction") and December, 2001 (the "Evergreen transaction"). The Seve and Evergreen transactions involved Perpetual Securities with aggregate face values of $175 million and $131 million, respectively. There are no material differences in how the three transactions were structured. Accordingly, for brevity's sake these facts will focus on only one of the transactions, the Evergreen transaction entered into in December of 2001.

The Perpetual Securities utilized in the Evergreen transaction were purchased by the Taxpayer from Morgan Stanley between November 15 and November 23, 2001, and are identified on Schedule A attached (the "Perpetual Securities"). The Perpetual Securities do not convey to their holders any voting rights with respect to their issuers. However, the Perpetual Securities entitle their holders to join with other noteholders in requesting the trustee to institute proceedings to wind up the issuer in the event of a partial default or "Reference Event."

The Evergreen Primary Trust ("Evergreen") is a Delaware business trust established pursuant to Delaware law on December 27, 2001. The Taxpayer is Evergreen's "Depositor" (trustor) and JPMorgan Chase Bank is Evergreen's principal trustee. The trust agreement provides that the trust is to be a grantor trust for purposes of Treas. Reg. § 301.7701-4.

On December 27, 2001, the Taxpayer conveyed to the trustee, without recourse, all of its rights, title, and interest in 10 specifically identified Perpetual Securities in exchange for 10 separate Principal Certificates and 10 separate Interest Certificates. The trustee held each security in a separate subaccount. Concurrently with the execution of the Evergreen Trust agreement, the Taxpayer caused the Perpetual Securities to be transferred by the issuers to the account of the trustee.

1. The Interest and Principal Certificates issued by Evergreen.

Each of the ten series of Interest and Principal Certificates represents beneficial interests in one of the Perpetual Securities held by Evergreen. For example, the A certificates represent fractional undivided beneficial interests in $15,500,000 in aggregate face amount of Perpetual Capital Floating Rate Notes issued by ANZ.

The Interest Certificates entitle a holder to receive payments equal to a pro rata share of the interest actually paid on the corresponding Perpetual Security (along with any income earned on such interest) during the "Restricted Interest Period." Barring the occurrence of certain "Reference Events" noted below, the Restricted Interest Period runs from December 27, 2001, to a specified "Redemption Date" in 2020. (The Redemption Dates of the ten series of Interest Certificates range from January 24, 2020, to June 30, 2020). Payments to the holders of the Interest Certificates are to be made on the day that interest is paid on the underlying Perpetual Security (or in some cases the following day). The Interest Certificates terminate and are automatically cancelled as of the applicable Redemption Date for that series of certificates.

The trust agreement defines the term "Reference Event" as any of the following:

(a) a default with respect to the Notes [i.e., the Perpetual Securities];

(b) a bankruptcy, insolvency, liquidation or winding up (or other similar event) with respect to the Note Issuer [i.e., the issuer of the Perpetual Security] (excluding any merger or non-bankruptcy related corporate reorganization of such issuer); or

(c) a mandatory redemption of all outstanding Notes prior to the applicable Redemption Date, for tax reasons or otherwise at the election of the Note Issuer pursuant to the terms of the underlying trust deed or any other instrument governing the Notes (a "Call Event").

To date, Taxpayer still holds all of the Interest Certificates. There have been no defaults or call events or other Reference Events.

The Principal Certificates represent an undivided beneficial interest in the corresponding Perpetual Security, exclusive of the right to interest paid on the Perpetual Security during the Restricted Interest Period. Any non-interest distributions (including partial redemptions) made on the Perpetual Security during the Restricted Interest Period are to be paid to the holders of the Principal Certificates.

On the Redemption Date for the series, the underlying Perpetual Securities are to be distributed to the holders of the Principal Certificates and the Principal Certificates are to be canceled. The Evergreen trust document provides that the holders of the Principal Certificates have the right to instruct the Trustee of Evergreen how to vote on any action requiring the vote or consent of the owners of the Perpetual Securities, and that in the absence of instructions from the holders, the Trustee is to vote "abstain." However, neither the holders of the Principal

Certificates nor the Trustee may take any action which will reduce or adversely impact the interest payable on the Perpetual Securities during the Restricted Interest Period, including, inter alia, redemption of the Perpetual Securities.

In the event a Perpetual Security is called prior to the applicable Redemption Date (a "Call Event"), the proceeds of the redemption (other than interest, if any) are to be distributed to the holders of the Principal Certificates. In the event of a default on the Perpetual Security or the bankruptcy, insolvency, liquidation, or the winding-up of a the issuer of the Perpetual Security (i.e., a "Reference Event" other than a Call Event), the Perpetual Securities are to be distributed to the holders of the Principal Certificates and the Principal Certificates are to be canceled. Nothing in the trust document or the certificates provides for the holders of the Interest Certificates to share in any part of the proceeds from the redemption of a Perpetual Security (other than accrued interest, if any). Likewise, neither the trust document nor the certificates provides for any part of the Perpetual Securities to be distributed to the holders of the Interest Certificates in the event of a default or other Reference Event.

2. <u>Sale of the Principal Certificates to Morgan Stanley</u>

On December 27, 2001, the Taxpayer sold and transferred the Principal Certificates to Morgan Stanley for $20,449,589. For Federal income tax purposes, the taxpayer claimed a capital loss on the transaction of $91,387,774. In calculating the claimed loss, the Taxpayer allocated the entire basis of the Perpetual Securities ($111,837,363) to the Principal Certificates. In 2001, the Taxpayer claimed a capital loss of $119,280,927 upon sale of the Seve Principal Certificates to Morgan Stanley. In the same manner, Taxpayer claimed a capital loss of $80,337,354 as a result of its sale of the Asgard Principal Certificates to Morgan Stanley.

3. <u>Morgan Stanley's Transfer of the Principal Certificates to Holly</u>

The Holly Issuer Trust ("Holly") is a Delaware business trust established pursuant to Delaware law on December 27, 2001. Morgan Stanley is Holly's trustor and JPMorgan Chase Bank is Holly's principal trustee. At the time of Holly's creation, Morgan Stanley transferred to Holly the Principal Certificates it acquired from the Taxpayer. In exchange for each series of Principal Certificates, Morgan Stanley received a series of Principal Units and Termination Units representing beneficial interests in the Principal Certificates. Each series of Principal Certificates is to be administered and accounted for as a separate trust property. The Holly trust agreement provides that the trust is to be a grantor trust for purposes of Treas. Reg. § 301.7701-4. Holly Trust, § 2.1(b). The terms of the Holly trust agreement in many respects mirror and refer back to the Evergreen trust agreement.

The purpose of the double trust structure was to provide comfort to the Principal Certificate holder against legal challenges to its ownership interest under Delaware law. The investments are nonrecourse in nature. The Principal Certificate holder did not wish to risk having a creditor "claw back" the Perpetual Securities in the event of a bankruptcy action by the Taxpayer. The trust structure provides that no creditor may attach the Perpetual Securities—only

the Interest Certificates. The Taxpayer cannot get back the Perpetual Securities under any circumstance.

The Principal Units represent the right to receive amounts equal to all payments or distributions made with respect to the underlying Principal Certificates other than certain amounts payable to the holders of the Termination Units. The Holly trust agreement also provides that the Principal Units convey the right to instruct the trustee how to vote the Principal Certificates. The Termination Units entitle the holders thereof to the right to receive amounts equal to a portion of any payments or distributions made with respect to the underlying Principal Certificates upon the occurrence of a Partial Redemption or a Reference Event. The Termination Units convey no interest in the trust property.

On the Redemption Date for a series of units (which is the same as the Redemption Date for the underlying Principal Certificate) all Termination Units in the series will terminate and be cancelled. Also at that time, the underlying Principal Certificates will be redeemed in exchange for the Perpetual Securities underlying the Principal Certificates and the Principal Units will in turn be redeemed in exchange for the Perpetual Securities. At that point the Principal Units will be cancelled. Thus, barring the occurrence of a Partial Redemption or Reference Event prior to the Redemption Date, the holders of the Principal Units will receive the Perpetual Securities underlying the Principal Certificates and the Termination Unit holders will receive nothing.

In the event of a Partial Redemption or the occurrence of a Reference Event (e.g., a default on, or call of, the Perpetual Security underlying the Principal Certificate) prior to the Redemption Date, any payments or distributions made with respect to the underlying Principal Certificates are to be made partially to the holders of the Principal Units and partially to the holders of the Termination Units.

In the case of a Partial Redemption or Call Event, holders of the Principal Units receive the "Principal Unit Cash Termination Payment," while holders of the Termination Units receive any cash payments made with respect to the underlying Principal Certificates to the extent they exceed the Principal Unit Cash Termination Payment. In the case of a Reference Event other than a Call Event, holders of the Principal Units receive the "Principal Unit Note Termination Payment" while holders of the Termination Units receive any Perpetual Securities underlying the Principal Certificates to the extent they do not constitute part of the Principal Unit Note Termination Payment.

The Principal Unit Cash Termination Payment is determined by multiplying the cash received on redemption of the Principal Certificates by the applicable allocation ratio set forth in the Holly trust agreement. Likewise, the Principal Unit Note Termination Payment is determined by multiplying the face amount of the Perpetual Securities received on redemption of the Principal Certificates by the applicable allocation ratio. The allocation ratio increases over time from around 25 percent (depending on the series) on December 27, 2001, to 100 percent on the particular series' Redemption Date

C. The Termination Agreement.

On December 28, 2001, the Taxpayer entered into a Termination Agreement with Morgan Stanley Credit Products Ltd. ("MSCPL") pursuant to which MSCPL agreed to make certain payments to the Taxpayer upon the occurrence of a Reference Event in exchange for the Taxpayer's payment of a premium in the amount of $5,000 with respect to each Perpetual Security. The aggregate premiums paid by Taxpayer were $50,000 with respect to the Evergreen Interest Certificates, $80,000 with respect to the Seve Interest Certificates, and $45,000 with respect to the Asgard Interest Certificates. The Termination Agreement expressly provides that Morgan Stanley "is acting as agent for both parties but does not guarantee the performance of [MSCPL]."

The term "Reference Event" is defined by reference to the Evergreen Trust agreement and includes (i) a default with respect to the perpetual security, (ii) the bankruptcy, insolvency, liquidation, or winding up of the issuer, and (iii) a call event. The amount to be paid by MSCPL in the event of a Reference Event was equal to the cash proceeds distributed by the issuer trust (i.e., Holly) multiplied by (1.00 – the allocation ratio). For each Perpetual Security, the Termination Agreement contains a table giving the allocation ratio for that Perpetual Security for each date throughout the life of the related Interest Certificate. As time goes by, the allocation ratio increases, and the amount the Taxpayer will receive in the event of a Reference Event decreases. The allocation ratios used for purposes of the Termination Agreement are identical to those used for purposes of the Holly trust agreement.

The parties regarded the likelihood of a Reference Event occurring as remote, which is reflected in the low premium paid. Nonetheless, if a Reference Event occurred, it would have rendered worthless the value of the remaining rights under the Income Certificate retained by the Taxpayer. Therefore, the purpose of the Termination Agreement was to compensate the Taxpayer with a payment in lieu of the income payments the Taxpayer would have received had a Reference Event not occurred.

II. Grounds Upon Which Claim For Refund Is Based.

A. Summary of Taxpayer's Position

The Taxpayer sold the Principal Certificates to Morgan Stanley, no allocation of any portion of Taxpayer's basis to the retained Income Certificates is required, and the loss realized on such sale is deductible under section 165.[1]

B. The Transactions Constituted Sales of the Principal Certificates

The Taxpayer sold the Evergreen Principal Certificates to Morgan Stanley in exchange for aggregate cash consideration of $20,449,589 and retained ownership of the Evergreen Interest Certificates. The courts and the Service have upheld transactions where the taxpayer

[1] In its Technical Advice Memorandum, the Service concedes that the Perpetual Securities are equity, not debt. Therefore, section 1286 does not apply.

sells property but retains an income interest in such property. For example, in *Heminway v. Commissioner*, 44 T.C. 96 (1965), the taxpayer's sister sold stock to the taxpayer, retaining for herself the right to receive all dividends paid on such stock for her life. The court held that the taxpayer's sister was taxable on the dividends, because although she transferred ownership of the stock to the taxpayer, she effectively retained the interest in the dividends so that they never became income of the taxpayer. *See also Bettendorf v. Commissioner*, 49 F.2d 173 (8th Cir. 1931) (reaching the same conclusion as *Heminway* under very similar facts); T.A.M. 8602006 (undated) (concluding that sale of notes with the interest coupons detached, prior to the enactment of section 1286, constituted a sale giving rise to a loss deduction).[2]

Similarly, a line of cases involving transfers of oil and gas interests with the retention of an interest in the oil produced supports treatment of the transfer as a sale. In *Thomas v. Perkins*, 301 U.S. 655, the owners of certain oil and gas leases assigned their interest in the leases to the taxpayer, with a portion of the purchase price payable solely out of one-fourth of all the oil produced. The Supreme Court held that the assignors had effectively retained ownership of one-fourth of the oil and sold the rest. The assignors, therefore, were taxed on the income from the one-fourth interest and entitled to a depletion allowance with respect thereto. *See also Palmer v. Bender*, 287 U.S. 551 (1933). *Cf. Anderson v. Helvering*, 287 U.S. 551 (holding that the assignor did not effectively retain an interest in the oil and gas property, but rather sold the entire property, because the seller was entitled to payment from the sale of the fee interest as well as from the production of oil and gas, in effect retaining a security interest, distinguishing *Thomas*). *See generally* Kenneth F. Joyce and Louis A. Del Cotto, *The AB (ABC) and BA Transactions: An Economic and Tax Analysis of Reserved and Carved Out Income Interests*, 31 Tax Law Rev. 121 (1976).

C. <u>The Taxpayer Properly Allocated Its Basis to the Principal Certificates</u>

When property rights are sold separately, it must be determined whether and how the cost basis is allocated. The case law governing assignment of income and, by implication, allocation of basis, dates back to the decision of the Supreme Court in *Lucas v. Earl*, 281 U.S. 111 (1930):

> There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew.

---

[2] Technical Advice Memoranda and Private Letter Rulings may not be used or cited as precedent. Code § 6110(k)(3). They are cited herein for the purpose of demonstrating the position taken by the Service on similar issues.

20

This principle was first applied in the context of a carved out, or stripped, income interest in *Helvering v. Horst*, 311 U.S. 112 (1940). In *Horst*, a father made a gift to his son of interest coupons from a bond owned by the father. The question before the Supreme Court was whether the income received by the son when the coupons matured was income to the son or to the father. The Supreme Court held that the father remained taxable on the interest income received by the son, reasoning that the father retained the "tree" and his attempt to gift the "fruits" was ineffectual:

> When, by the gift of the coupons, he has separated his right to interest payments from his investment and procured the payment of the interest to his donee, he has enjoyed the economic benefits of the income in the same manner and to the same extent as though the transfer were of earnings and in both cases the import of the statute is that the fruit is not to be attributed to a different tree from that on which it grew.

In *Hort v. Commissioner*, 313 U.S. 28 (1941), the taxpayer inherited a building subject to a 15-year lease. The lessee paid the taxpayer an amount to cancel the lease. The taxpayer argued that the amount it received for cancellation of the lease was a return of capital and that the difference between such amount received and the present value of the unmatured rental payments was deductible as a loss. The Supreme Court rejected this argument and held, because the taxpayer had no capital invested in the lease, no part of the amount received was return of capital. Instead, the entire payment was a substitute for rental payments due under the lease was includable as ordinary income. The fact that the entire payment was treated as ordinary income and not a return of basis clearly implies that no part of the building's basis was allocable to the lease.

In *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260 (1958), the Supreme Court extended the assignment of income doctrine to non-gratuitous transfers of income rights. In that case, the taxpayer owned a working interest in two commercial oil and gas leases. It repaid a debt by assigning to its creditor the right to proceeds from a stipulated amount of oil and gas and reported the assignment as a sale taxable at long-term capital gains rates. The Supreme Court held that the sales proceeds constituted ordinary income, reasoning that:

> We do not see here any conversion of a capital investment. The lump sum consideration seems essentially a substitute for what would otherwise be received at a future time as ordinary income. . . . We have held that one entitled to receive at a future date interest on a bond or compensation for services, makes a grant of it by anticipatory assignment, he realizes income as if he collected the interest or received the salary and then paid it over.

The logical corollary of this rule governing assignment of income is that the entire basis remains allocable to the corpus of the property. *See* McGrath, *Coupon Stripping Under Section 1286: Trees, Fruits, and Felines*, 38 The Tax Lawyer 267, 281 (Winter 1985). Indeed, some

authorities expressly confirm this corollary. In *Estate of Stranahan v. Commissioner*, 472 F.2d 867 (6th Cir. 1973), the taxpayer had a large interest deduction and insufficient income to offset it. In order to accelerate income to utilize the deduction, the taxpayer sold to his son the right to future dividends on stock owned by the taxpayer and reported the entire cash proceeds as income in the year of the sale. The Sixth Circuit Court of Appeals rejected the government's argument that the taxpayer, and not the son, should be taxable on the dividends, concluding that the transaction ought to be respected even though the sole aim was to accelerate income. The court held that under the "long-standing principles" of *Hort* and *P.G. Lake*, a taxpayer who assigns future income realizes ordinary income in the year of the disposition. The court distinguished *Horst* on the basis that *Horst* involved a gratuitous transfer. The entire amount of the cash proceeds was included in income, with no allocation of basis to reduce such amount.

In *Apex Corp. v. Commissioner*, 42 T.C. 1122 (1964), the taxpayer sold the right to receive income under a lease of office equipment to one corporation and then sold the underlying office equipment, subject to the lease, to another corporation. The taxpayer allocated its full basis to the underlying equipment, deducted an ordinary loss on the sale of the equipment, and reported gross income in the full amount of the proceeds received on the sale of the leases. The Service disallowed the loss, but the Tax Court upheld the taxpayer's treatment. In so holding, the Tax Court rejected an alternate argument made by the taxpayer that Treas. Reg. § 1.61-6(a) required an allocation of basis between the equipment and the leases.

*See also Shafer v. United States*, 204 F. Supp. 473 (S.D. Ohio 1962), *aff'd*, 312 F.2d 747 (6th Cir.), *cert. denied*, 373 U.S. 933 (1963) (holding that proceeds from the sale of coupons associated with Japanese government bonds constituted ordinary income); *Rhodes' Estate v. Commissioner*, 131 F. 2d 50 (6th Cir. 1942) (holding that proceeds from the sale of a right to receive a declared but unpaid dividend constituted ordinary income); Rev. Rul. 58-337, 1958-2 C.B. 13 (ruling that an assignment of a lease that transferred only the rights to the rents constitutes an assignment of ordinary income for which the grantor remains taxable); T.A.M. 8049018 (Sept. 2, 1980) (ruling that amount realized from the sale of interest coupons constituted ordinary income to the seller in the year of the sale); *Mapco, Inc. v. United States*, 556 F.2d 1107 (Fed. Cir. 1977) (stating that "[w]e also recognize that a taxpayer may sell a property right to future income. If the bona fide sale occurs at arm's length for adequate consideration, the seller is taxed in the year of sale on the amount of consideration he actually receives" unreduced by any basis).

The Service itself has also concluded that the assignment of income doctrine requires allocation of basis solely to the corpus. In T.A.M. 8602006, the taxpayer sold certain of its notes but retained the interest coupons prior to the enactment of section 1232B (now section 1286) in 1982. The Service ruled that the taxpayer is not required to allocate basis between the detached interest coupons and the stripped note principal for purposes of computing loss on the subsequent sale of the principal. The Service reviewed the *Hort*, *P.G. Lake*, *Horst*, and *Estate of Stranahan* cases and concluded:

> The Hort, Lake, Horst and Stranahan cases, despite their differing factual situations and legal issues, support the general proposition

> that (prior to section 1286 of the Code) when the right to future income is conveyed by an owner of property that will produce such income, the seller-owner is not permitted to offset any of his or her basis in the property against the sales proceeds. *In applying that proposition to this case, we have concluded that the basis of the notes must be allocated to the corpus of such notes and cannot be allocated between the corpus of such notes and the interest coupons.* (Emphasis added.)

The Service reached the same conclusion under very similar facts in T.A.M. 7934003 and P.L.R. 8108108. *But see* T.A.M. 8827002 (Mar. 30, 1988) (wherein the Service reversed its position).

The law therefore appears clear that a security may be separated into interest and principal components, each may be sold as separate asset, and the asset's cost basis remains allocable to the corpus interest and no portion of it is allocable to the income interest. Indeed, Congress has recognized the ability to sell interest and principal components as separate assets and, in the case of debt instruments, has provided rules to govern certain of these sales. *See* Code §§ 305(e), 1286.

D. <u>The Termination Agreement Produced No Retained Interest.</u>

The Termination Agreement was entered into between the Taxpayer and MSCPL on the day after the Taxpayer sold the Principal Certificates to Morgan Stanley. It was supported by adequate, separately bargained-for consideration. MSCPL, though affiliated with Morgan Stanley, is a separate legal entity. Moreover, the Termination Agreement expressly stated that Morgan Stanley was not guaranteeing MSCPL's performance under the agreement. MSCPL was not a party to the sale of the Principal Certificates or to either of the trust agreements and was not obligated to enter into the Termination Agreement. Nor was Morgan Stanley obligated to enter into a termination or similar agreement by reason of its purchase of the Principal Certificates or its participation in either of the trusts. These facts support the Taxpayer's position that the Termination Agreement was separate from the trust.

Assuming arguendo that the Termination Agreement is viewed as having occurred within the Evergreen Trust, it does not represent a continuing interest in the principal of the Perpetual Securities. When the Taxpayer sold the Principal Certificates to Morgan Stanley, it transferred all benefits and burdens of ownership of the principal of the Perpetual Securities and retained all benefits and burdens of ownership of the interest income from the Perpetual Securities. By entering into the Termination Agreement, the Taxpayer did not reacquire any of the benefits and burdens of ownership of the principal of the perpetual security. It cannot sell, pledge, or otherwise dispose of the Principal Certificate; it is not entitled to any principal payments on the Perpetual Security; it has no enforceable rights against either the trustees or the issuers. All it acquired was an unsecured money claim against MSCPL. The Termination Agreement simply permitted the Taxpayer to obtain a payment from MSCPL in the event a Reference Event occurred. The amount of the payment was based on a predetermined formula reflecting the parties' estimates of the economic exposure resulting from the occurrence of a Reference Event

at a given time during the term of the Termination Agreement. Accordingly, the Termination Agreement is essentially an insurance policy or guarantee by MSCPL that the Taxpayer would get the benefit of the income interest it bargained for.

The courts and the Service have concluded that the securing of similar rights does not prevent a sale from occurring. For example, in Rev. Rul. 65-185, 1965-2 C.B. 153, X, an automobile dealer, assigned customer installment contracts to Y as collateral for a loan. The agreement designated Y as X's agent to collect the installment payments from customers, and customers were instructed to make payments to Y. Payments on the installment notes were applied by Y to the payment of X's loan, but X was required to make the payments on its own note if the customer defaulted on the installment note. The Service concluded that the arrangement constituted a sale by X of the installment obligations to Y, with recourse or other guarantee of payment in the event of a customer's default on its installment note, notwithstanding that the guarantee had the effect of shifting the risk of loss to the transferor-guarantor.

The Service subsequently elaborated on the effect of such a recourse right or guarantee:

> [W]e believe that before a transaction with a guarantee against loss by the transferor is classified as a sale, the elements of the transaction should be analyzed under the same criteria used for sales where the purchaser is not personally liable on the purchase money mortgage. In other words, although the seller retains the risk of loss, a transaction can still be classified as a sale where (1) the purchaser obtains the benefit of any profit through an appreciation in value of the obligation; (2) the purchaser has the power of absolute disposition; and (3) the total purchase price is fixed when the transfer occurs.

G.C.M. 34,602 (Sept. 9, 1971); *see also Elmer v. Commissioner*, 65 F.2d 568 (2d Cir. 1933); *Mathers v. Commissioner*, 57 T.C. 666 (1972); *United Surgical Steel Co.*, 54 T.C. 1215; *Packard Cleveland Motor Co. v. Commissioner*, 14 B.T.A. 118 (1928); T.A.M. 199909002 (Sept. 30, 1998); G.C.M. 39,584 (Dec. 3, 1986); G.C.M. 37,848 (Feb. 5, 1979).

Since the payment under the Termination Agreement was designed to compensate the Taxpayer for its lost income stream in the event of an unexpected termination of the income-producing asset, the character of any payment received under the Termination Agreement would be ordinary, not a return of capital as it would be if the payment resulted from a retention of principal. In *Commissioner v. Ferrer*, 304 F.2d 125, 130-31 (2d Cir. 1962. *See also Hort v. Commissioner*, 313 U.S. 28 (1941) (holding that a lease termination payment was a substitute for rental payments, not a return of capital, and therefore constituted ordinary income); *Kathman v. Commissioner*, 50 T.C. 125 (1968) (holding that a payment from the cancellation of a contract entitling the taxpayer to sales commissions was a substitute for such commissions, and therefore constituted ordinary income).

E. Remoteness Of The Contingency Under The Termination Agreement Requires That Any Partial Interest Retained Be Deemed Negligible And Valueless.

Even if the taxpayer is considered to have retained an interest in the principal of the Perpetual Securities by virtue of the Termination Agreement, the remoteness of the occurrence of any Reference Event requires that such interest be ignored.

In Letter Ruling 200610017, a railroad conveyed its abandoned right-of-way to be used as recreational trails, but retained the right to reactivate the rail line in the future. In considering whether retention of the right to reactivate the line negated a charitable deduction, the Service acknowledged that the taxpayer had retained a partial interest in the railroad right-of-way, but it applied the "insubstantiality rule" expressed in *Stark v. Commissioner,* 86 T,C, 243 (1986), Revenue Ruling 75-66, 1975-1 C.B. 85, and Revenue Ruling 76-331. It thus held that "[w]here the interest retained by the taxpayer is so insubstantial that he has, in substance, transferred his entire interest in the property, the tax treatment should so reflect."

Equally important, the Service went on to address the separate question of the impact of remoteness on the possibility that the act or event might occur, and it held that the intended tax consequences will not be defeated where "the possibility that such act or event will occur is so remote as to be negligible." Citing *U.S. v. Dean,* 224 F.2d 26, 29 (1st Cir. 1955) and *Briggs v. Commissioner,* 72 T.C. 646 (1979), which employed the standards used in estate tax cases to determine remoteness, the Service stated that the phrase "so remote as to be negligible" means "a chance which persons generally would disregard as so highly improbable that it might be ignored with reasonable safety in undertaking a serious business transaction." Citing Revenue Ruling 85-23, 1985-1 C.B. 327, Revenue Ruling 78-255, 1978-1 C.B. 294, and Revenue Ruling 77-374, 1977-2 C.B. 329, it stated that it has "consistently ruled that the chances of an event occurring is "so remote as to be negligible" . . . when the chance that the event will occur is less than 5 percent." Moreover, since probability and possibility are factual concepts, the issue is a question of fact and the factual determination is to be made by evaluating several factors, including the incidence of the event's occurring in the past.

Applying these principles to this case, the taxpayer maintains that it can show that the chances of a Reference Event occurring under the Termination Agreement are less than 5%, and that, accordingly, any partial interest deemed retained should be ignored. Further, the remoteness of the contingency requires that any partial interest deemed retained be valued at zero, or that it be deemed incapable of valuation or *de minimis*. Under these circumstances, no portion of the basis of the Principal Certificates may be assigned to the Income Certificates.

F. Taxpayer's Non-Tax Business Purpose Shows Economic Substance

The Taxpayer's legitimate business purpose for entering into these transactions is extensively set forth in the first two portions of this narrative. That indisputable business purpose precludes a finding that the transaction is a sham and the Taxpayer's expectation of profit, i.e., an income stream, imbues the transactions with requisite economic substance.

In *Frank Lyon Co. v. U.S.*, 435 U.S. 561, 583-584 (1978), the Supreme Court issued the following mandate:

> [W]here, as here, there is a genuine multi-party transaction with economic substance which is compelled . . . by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.

In *Black & Decker Corporation v. U.S.*, 436 F.3d 431 (4th Cir. 2006), the Fourth Circuit stated:

> The sham transaction doctrine permits the IRS to disregard a transaction that literally complies with the terms of the IRC but that is *devoid of any legitimate business purpose*. (Emphasis supplied.)

Referring to *Frank Lyon Co., supra,* the Fourth Circuit stated that it distilled from that guidance the two-part test enunciated in *Rice's Toyota World, Inc. v. Comm.*, 752 F.2d 89, 91 (4th Cir. 1985:

> To treat a transaction as a sham, the court must find (1) that the taxpayer was motivated by *no business purposes* other than obtaining tax benefits in entering the transaction, and (2) that the transaction has no economic substance because *no reasonable possibility of a profit* exists. (Emphasis supplied.)

It then went on to quote from its prior decision in *Hines v. U.S.*, 912 F.2d 736, 739 (4th Cir. 1990):

> While it is important to examine both the subjective motivations of the taxpayer and the objective reasonableness of the investment, in both instances our inquiry is directed to the same question: whether the transaction contained economic substance aside from the tax consequences.

In *ACM Partnership v. Commissioner*, 157 F.3d 231, 252 (3d Cir. 1998, *cert. denied*, 526 U.S. 1017 (1999) the court held that the transaction in issue was a sham possessing neither

subjective business purpose nor objective economic substance and disallowed the loss. However, the court acknowledged that if the transaction had economic substance, the loss would have been allowable, despite the fact that it did not result in an economic detriment. *See ACM*, 157 F.2d at 248, n.31. Because the transaction had no economic substance, the entire transaction, including the tax loss, was disallowed. In the present case, the transaction had a non-tax business purpose and resulted in a real transfer of the economic benefits and burdens of ownership of the Principal Certificates. Therefore, the sale was bona fide, and any loss from that sale is deductible under section 165.

## CONCLUSION

The Taxpayer's loss upon sale of the Principal Certificates is a bona fide loss allowed under section 165. Because basis is not allocated to the stripped income interest, the transaction resulted in a bona fide capital loss deductible for tax purposes in its entirety.

SCHEDULE A

PERPETUAL SECURITIES - EVERGREEN TRANSACTION

| Issuer/ ISIN/ Symbol | Face Amount/ Issue Date | Interest/ Payment Schedule | Purchase Price |
|---|---|---|---|
| Barclays Bank GB0000779529 BACR FLOAT 0749 | $4.000.000 July 2, 1985 | 6M LIMEAN +25 Semi-annual | $3,470,000 |
| Barclays Bank GB0000777705 BACR FLOAT 0849 | $11,000,000 Feb. 14, 1986 | 6M LIBID +25 Semi-annual | $9,515,000 |
| Royal Bank of Scotland GB0007547507 RBOS FLOAT 1249 | $7,000,000 Dec. 11, 1985 | 6M LIMEAN +25 Semi-annual | $5,862,500 |
| Lloyds Bank GB0005224307 LLOY FLOAT 0649 | $27,000,000 June 7, 1985 | 6M LIBOR +25 Semi-annual | $23,346,000 |
| Lloyds Bank GB0005205751 LLOY FLOAT 1149 | $19,410,000 Nov. 21, 1985 | 3M LIBOR +18.75 Quarterly | $16,573,775 |
| National Westminster Bank GB0006267180 RBOS FLOAT 0849 | $15,700,000 July 9, 1985 | 6M LIMEAN +25 Semi-annual | $13,415,000 |
| National Westminster Bank LU0001547172 RBOS FLOAT 0849 | $15,000,000 Nov. 27, 1985 | 3M LIBID +25 Quarterly | $12,915,000 |
| Australia & New Zealand Bank GB0040024555 ANZ FLOAT 1049 | $15,500,000 Oct. 30, 1986 | 6M LIBOR +15 Semi-annual | $13,252,500 |
| BNP FR0008131403 BNP FLOATR 0949 | $6,810,000 Sept. 22, 1986 | 6M LIBOR +7.5 Semi-annual | $5,507,587 |
| Paribus GB0040811647 BNP FLOAT 0949 | $9,500,000 July 11. 1986 | 3M LIBOR +12.50 Quarterly | $7.980.000 |
| | $130,920,000 | | $111,837,362 |



28

1. Barclays Bank Notes (BACR FLOAT 0749 & BACR FLOAT 0849). The offering circulars describe the Barclays notes as "undated floating rate primary capital notes" of Barclays Bank PLC. The notes were issued by Barclays in 1985 and 1986 in denominations of $10,000 and $100,000 (one issue was for a total of $750,000,000, the second was for a total of $600,000,000). The notes have no final maturity and will never be repaid except as provided for below. The note holders are entitled to receive interest from Barclays semi-annually at an interest rate of LIBOR plus % percent (CPN = 6M LIBID + 25 basis points). The notes are unsecured obligations of Barclays, rank pari passu without any preference among them, and are subordinate to senior creditors. Payments of principal and interest are conditional on Barclays being solvent at the time of payment and immediately thereafter. If the bank would not otherwise be solvent, the amount of principal and interest in respect of the Perpetual Securities will be available to meet the losses of the bank. In the event that Barclays winds-up business in England, the noteholders will be treated as if they were the holders of a class of preference shares in the capital of the bank having a preferential right to a return of assets in the winding up over the holders of all other classes of shares for the time being in the capital of the bank. In the event of the nonpayment of interest, the note holders have no recourse against Barclays so long as Barclays has not paid dividends to its shareholders. Any such interest not paid goes into arrears. Interest in arrears shall become due in full on the earliest of (i) the date upon which a dividend is next paid on any class of share capital, (ii) the date fixed for any repayment pursuant of Condition 4 (a) or (b) [having to do with the repayment of the notes], or (iii) the commencement of a winding up in England of the Bank. Arrears of interest do not themselves bear interest. In the event Barclays Defaults on a payment of interest, a trustee identified in the offering circulars may bring a proceeding in England on the holders' behalf. The trustee shall not be bound to take any such action unless requested by an Extraordinary Resolution of the noteholders or in writing by the holders of at least 25 percent of the principal amount of the notes then outstanding. The noteholders do not have any remedy against Barclays other than the institution of proceedings for the winding up of the bank. The notes will only be repaid in the event: a) of a recovery by the trustee after default; b) Barclays exercises its option to purchase the notes from the holders; c) Barclays purchases the notes in the open market; or d) Barclays becomes required to withhold taxes.

2. Royal Bank of Scotland Notes (RBOS FLOAT 1249). The offering circulars describe the Royal Bank of Scotland notes as "undated floating rate primary capital notes" of the Royal Bank of Scotland ("RBS"). The notes are essentially identical to the Barclays notes except that they were issued in denominations of $10,000 and $250,000, and the RBS has the option to repay the notes after December, 1999.

3. National Westminster Bank Notes (RBOS FLOAT 1149 & RBOS FLOAT 0849). The offering circulars describe the Westminster notes as "primary capital floating rate notes" of National Westminster Bank ("Westminster"). In 1985, Westminster issued two series of notes in denominations of $10,000 and $100,000. Both series were for a total of $1,000,000,000. The notes are essentially identical to the Barclays notes except that they are issued by Westminster.

4. Lloyds' Bank Notes (LLOY FLOAT 0649 & LLOY FLOAT 1149). The offering circulars describe the Lloyds notes as "undated floating rate primary capital notes" of Lloyds Bank PLC. In 1985, Lloyds issued two series of notes in denominations of $10,000 (one issue was for a total of $750,000,000 and the second was for a total of $600,000,000). The terms of the notes are essentially the same as those of the Barclays notes. The holder of LLOY FLOAT 0649

is entitled to receive interest from Lloyds semi-annually at a rate.of LIBOR plus I/ percent (25 basis points). The holder of LLOY FLOAT 1149 is entitled to receive interest from Lloyds semi-annually at a rate of LIBOR plus .1875 percent (3M LIBOR + 18.75).

5. Australia and NZ Bank Notes (ANZ FLOAT 1049). The offering circulars describe the ANZ notes as "perpetual capital floating rate notes" of Australia and New Zealand Banking Group, Ltd. ("ANZ"). In 1986, ANZ issued a series of notes in denominations of $10,000 and $250,000. The notes pay interest semi-annually at a rate of LIBOR plus .15 percent. The notes are essentially identical to the Barclays notes except they are issued by ANZ.

6. BNP Notes (BNP FLOATR 0949). The offering circular describes the BNP notes as "undated subordinated floating rate notes" of Banque Nationale de Paris ("BNP"). The terms of the notes are similar to the other Perpetual Securities. The notes issued on July 11, 1986, with a face value of $6,820,000 pay interest semi-annually at a rate of LIBOR plus .75 percent (6M LIBOR +7.5). The notes issued on September 22, 1986, with a face value of $9,500,000 pay quarterly interest at a rate of LIBOR plus .12 percent (3M LIBOR +12.5). The notes are subject to French law.